Andrew J. **LEONARD**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

No. 16114.

United States Court of Appeals
Ninth Circuit.

April 6, 1960.

Edgar Paul Boyko, Los Angeles, Cal., for appellant.

William T. Plummer, U. S. Atty., George N. Hayes, Asst. U. S. Atty., Anchorage, Alaska, for appellee.

Before BARNES, HAMLEY and JERTBERG, Circuit Judges.

JERTBERG, Circuit Judge.

On the 24th day of January, 1958, appellant was committed to the custody of the Attorney General of the United States for imprisonment for a period of six years, following his conviction by

a jury of the offense of transporting in interstate commerce a forged instrument, in violation of the provisions of Title 18 U.S.C.A. § 2314.[1] Notice of appeal was timely filed in this Court on the 31st day of January, 1958.

Jurisdiction of the district court was conferred by Title 48 U.S.C.A. § 101. Jurisdiction of this Court is based upon Title 28 U.S.C.A. §§ 1291 and 1294, prior to the amendments appearing in Public Law 85–508, 72 Stat. 339. For such amendment see Parker v. McCarrey, 9 Cir., 1959, 268 F.2d 907.

Appellant contends that the district court erred in admitting into evidence a written confession which appellant claims was obtained under circumstances of duress; in refusing to declare a mistrial because of alleged prejudicial misconduct of the prosecuting attorney in his opening statement; in the giving of an instruction to the jury in relation to the opening statement which appellant claims was inadequate and damaging; and in failing to grant a motion for acquittal based upon lack of proof of the corpus delicti.

We will first consider the appellant's contention that the district court erred in refusing to grant appellant's motion for a mistrial.

It appears that as soon as the jury was empaneled to try the cause the court directed government counsel to make his opening statement, to which counsel replied, "Your Honor, may I have about 5 minutes. We've got the jury faster than I contemplated and I'd like to complete putting something on the board that I want to use in my statement * * *." Following the recess, the court again directed counsel to make his opening statement, to which counsel replied:

"Thank you, your Honor. May I have the pointer, please? Now, what I say to the court and jury,

I thought it might be helpful to you and lend clarity to the presentation of the Government's case as well as your visualization of the defense, if there is any, to enumerate the several elements of the crime that the Government is charging in this indictment."

Counsel then proceeded to enumerate the elements of the offense charged in the indictment, and then stated:

"In most criminal cases the prosecution is unable to show any other crimes committed by the defendant. I am going to be able to do that in this case, however, because the defendant's plea of not guilty has put in issue every material ingredient of offense charged against him, and remember that an element, or ingredient No. 4 in the charge against the defendant is that he caused the check to be transported. He had the intent to defraud Morrison-Knudsen Company.

"Now, it has been an ancient and honorable doctrine in the law that the prosecution is not able to show a jury any other crimes committed by the defendant because the law in its wisdom has it that no one shall be convicted because a jury shall conclude from other crimes that he is a bad man and because he is a bad man reasoned that he must have committed this particular crime. And that is a very good rule. However, that rule has about seven classical exceptions and two of the exceptions fit this case and thus enable the Government in this instance to bring to your attention some of the other crimes.

"Now, when I say 'other crimes', I am not talking about previous convictions. I make no intimation whatsoever on the subject of pre-

[1]. Sec. 2314 in its pertinent part provides that "Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce any falsely made, forged, altered, or counterfeited securities, know- ing the same to have been falsely made, forged, altered or counterfeited * * * shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

vious convictions. When I say that the Government by the exceptions that exist to this ancient doctrine to the law is able to show other crimes committed by this defendant I am speaking about crimes that have never been made the subject of indictment or in which this defendant stands unconvicted and unpunished. How am I able to do that? By virtue in this case of two of those seven exceptions that I mentioned. The rule is ordinarily you can't show other crimes, but in this case we are able to do it on two exceptions to that principle of law.

"The first exception is that whenever a defendant denies having the specific intent charged by the Government, and he does in this case because his plea of not guilty puts it into issue and constitutes a denial of the Government's claim, that he had the specific intent to defraud and the law says that whenever an individual denies by his plea of not guilty of having a specific intent or a particular kind of intent, the Government may bring in other crimes to show that he did have that intent.

"That is our purpose in bringing to your attention these other crimes to show you that this defendant did have the specific intent to defraud Morrison-Knudsen Company as the company says in the indictment.

"The other exception to that ancient rule I mentioned is that whenever it is desirable or necessary to identify the defendant as the person committing the instant crime, the Government may introduce similar crimes, crimes of a similar nature committed by the defendant in order to assist in establishing that identity. Thus it is that the Government brings to you, not alone the one crime charged in the indictment, but a great number of other crimes, all of which will be shown to you as having been confessed to by this defendant, although they have not as yet been the subject of indictment or

prosecution, conviction, or penalty. These crimes number 84. They are all felonies. Yes, you heard me correctly. I said 84. Incredible, but true. I should say, to be absolutely accurate, 83 other crimes other than the indictment crime. Thus it is that the presentation of our evidence falls into three parts. Would the bailiff turn around the blackboard. (The bailiff did so.)

"I was just saying that the presentation of our evidence will fall roughly into three parts. And I have put these three parts on the blackboard and I hope that each of you can see. If there is any juror who can't see a raising of the hands will probably permit us to shift this blackboard. Now, I have used a little system that I have seen accountants or bookkeepers use and what I have done here is the subject parts of these various crimes I have put in tabular order here and then I have added them up, you see, and carried that over in that fashion and then in the very last imaginary table of all I have put my grand total.

"A part of our presentation will concern the crime alleged in the indictment. There is only one crime, one count in the indictment and therefore it contributes to the grand total. The central portion of our presentation to you, which will not actually take very long because it will be handled by the route of presenting to you one confession, one document and that confession by the defendant will constitute what I term the middle group. That is 'B' part here, the middle group of crimes, and 'C' part, of what I term here for convenience, the Fairbanks group will show the Fairbanks crimes. Now, the middle group we have here, William A. Smith, Contracting Company. The letter 'F' hyphen 'U' I have used as sort of a shorthand to indicate forging and uttering and I must advise you that in the totals out here the subtotals

here and of course in the grand total I have counted each forgery as one crime and each uttering as another crime. Ordinarily, when a check is forged and then passed by getting it cashed, you have one unitary transaction, one transaction, but it gives rise to two violations of law, one being forgery and the other being uttering. In the case of William A. Smith, Contracting Company, the evidence of the Government will show that there were 14 felonies committed by this defendant consisting of forgeries and utterings, seven forgeries, seven utterings.

"The second group here in our middle group, 'FWS,' standing for Fish and Wildlife Service. The 'FOS' is my own little abbreviation for false official statement. The evidence on this Fish and Wildlife Service crime will show you that the defendant made out, that is, made an application for a fishing license under a false name. And this last one, 'A.H.A.' stands for Alaska Housing Authority, 12 felonies forging and uttering, six checks here, seven checks up here, a false official statement here. And subsequent to this conduct or at about the same time the defendant betook himself to Fairbanks and there engaged in a conspiracy and an attempt to commit a gigantic swindle in cooperation and colleague with one Robert Jackson an importation from the States brought into the ring here for certain services that will be in a moment explained to you, a local man.

"Now, these 56 crimes that were committed in the Fairbanks episode occurred in this fashion. They break down as follows: six crimes committed by forging and uttering, there being six checks involved and two crimes on each check. And I have abbreviated this 'C.A. to F.U.' conspiracy and an attempt to forge and utter 50 other checks. That is, 25 other checks which give us a total of 50 crimes because each for-

gery and uttering constitutes a separate crime giving for the Fairbanks group a total of 56 crimes conspired to or attempted, which includes six crimes actually committed. That is, six checks actually forged and actually passed by this defendant, giving us the astonishing total of 84 crimes including the one for which he is presently being prosecuted.

"Now, will the bailiff assist me, please, in turning around the blackboard. (The bailiff did so.)

"Before I give you the explanation of the crime charged in the indictment I want to recite for you some of the false names used by this man in perpetrating these 84 crimes. In the indictment crime he used the false name, Joe Hill. In the false official statement made to obtain a fishing license he used the false name Don Woods. In the Alaska Housing Authority forging and uttering, 12 offenses, he used the names Eddie Wilson and Bobby Wilson. And with respect to the Fairbanks group of crimes when he registered in a hotel room he registered as James Williams or James Wilson. It is quite impossible to determine absolutely because the manager of that hotel was subpoenaed and telegraphed—I got the telegram this morning—she could not appear due to complete disability. In addition to the names, said James Wilson or James Williams used to register at the Fairbanks hotel, this defendant used on the 50 crimes conspiracy and attempts, the name Willie Lee Andrews. Willie Lee Andrews. A total, I believe, of nine false names that will appear as used by this defendant in the evidence to be presented to you." (Sic.)

Counsel then proceeded to outline the matters he expected to prove in connection with the forged security described in the indictment. Counsel then proceeded:

"Now, I think that it would be, as it were, guilding the lily, if I may

use such a term, to describe the middle group of crimes. I am not going to describe them to you any more except merely to say—may we have the board turned around, please, sir, (did so)—except merely to say that the defendant in the middle group of crimes held through to his M.O.—remember, method of operation—and got work for a short time with the—no, I beg your pardon. I think in this particular W. A. Smith thing he broke into, it will show, he burglarized the Smith Company and stole the checks out and, by the way, that reminds me, in my compilation of 84 crimes I have wholly excluded counting the incidental crimes, such as burglary and larceny that were occasionally committed in order to get hold of the instruments or checks that were forged. In the W. A. Smith episode there was breaking and entering. I have described the Fish and Wildlife matter to you. And the Alaska Housing Authority, again he followed his M.O. thereby getting work as a janitor or helping a janitor and got the checks out of the Alaska Housing Authority and forged them and cashed them as a result of access that he had by being a janitor there.

"Now, he departed from his M.O. a little bit in the Fairbanks group of checks, embarking on a colossal scheme here to cheat and defraud. There was a man named Jackson, Robert Jackson in the States, the evidence will show you, and this defendant was, according to his own admission, was brought into the picture by one John D. Sunny Parks, who is going to appear before you and testify. Mr. Parks had contact with Jackson in the States. And brought Jackson to the Territory for the purpose of executing this gigantic swindle which but for the alertness of the local law enforcement people would have been inflicted upon the community. Jackson was brought to Fairbanks for the purpose of executing this swindle. He was supposed to have 50 checks printed, printed up, don't you see, just for the occasion. Each check, the plan was, would be in the amount of $100.00. And they would be drawn on a stateside bank and this defendant and Jackson coming, up from the States, bringing the checks and the local man, John D. Sunny Parks, would forge these checks here in the Territory and issue or pass these 50 checks, each in the amount of $100.00, giving them $5,000.00 of swag, which they would divide according to their respective interests and according to the expense of each. Jackson, instead of having checks printed specially for the occasion, apparently stole the checks or had them stolen or acquired stolen checks but never—at least the scheme was not dropped because they were stolen. The role played by this defendant was not as active as it would have been, he admits in his confession, were it not be for the fact the police were so hot after him that his role was largely limited to doing the writing in the forgeries. In fact, his confession, which will be read to you, states that he told his confederates, 'Well, now, I can't help you push the checks.' That is the underworld slang for passing. 'I can't help you push them. I am too hot, but I will help you forge them.' Although he wasn't going to pass any according to his original position and his local necessities compelled him to make use of three of them and these three checks, after having forged them, he cashed, with the aid and assistance of a lady named Ruth Lee of Fairbanks. And I have subpoenaed her here and I hope that she will give you available, helpful information. I might say to you in connection with this Fairbanks episode, since this matter was confided to my responsibili-

ty only three and a half working days ago, I have been unable to interview the witnesses on the Fairbanks episode. Although they will be, in a sense, questioned cold by me, I think that the presentation will still be adequate to meet your approval.

"The group here of 25 checks, after being forced, were placed in Robert Jackson's automobile and he was apprehended at Palmer. And there is one thing I want to draw to your attention about this aspect of the Government's evidence. The Government is going to introduce the personal papers and credentials of several persons, these credentials and papers being found in the automobile of Robert Jackson. The Government's evidence will not show that the defendant was in the automobile, but he will be linked to the automobile by many other aspects of the evidence and by his own confession.

"If you wonder at the time of introduction why the Government is introducing drivers' licenses, social security numbers on James Berry Hill, on a man named Connelly and on a man named Stone and perhaps on one or two other people, I think perhaps my explanation may have dissipated your inquiry. That would be the purpose of it, to show the possession of the private documents of a great many different people by Jackson, for use by Jackson and Parks and this defendant in this swindle.

"Now, the Fairbanks group of checks were all made out by Mary Andrews. That is the fictitious Mary Andrews. All those checks were signed Mary Andrews and made payable to Willie Lee Andrews. Of course, Willie Lee Andrews was the name under which this gang was going to pass these checks. And, of course, professionals as they were, they had plenty of personal credentials that show Willie Lee Andrews driver's license, social security number, all sorts of things of that kind, on Willie Lee Andrews. And who was Willie Lee Andrews? The Government's inference is—the inference the Government asks you to make with respect to that part of the evidence is that Willie Lee Andrews is undoubtedly some living soul who has been rolled or robbed or has his personal papers stolen, and as long as the description of Willie Lee Andrews on these personal paper fits the description of one of these defendants they then can pass these documents, these checks, and get them cashed. If they are asked for identification they can produce all kinds of personal papers of Willie Lee Andrews proving they are Willie Lee Andrews.

"I think I have concluded my presentation." (Sic.)

At the conclusion of the opening statement, court appointed counsel for the appellant moved the court for a mistrial on the ground that the reference to 83 crimes not charged in the indictment was improper and prejudicial. Then followed conferences between the court and counsel in chambers and at the bench, during which proceedings the district court stated:

"Now Mr. Davis [counsel for appellant], had you objected, as the opening statement was up around 40 minutes and no objection was made, then you would be in much better position to have made your motion for mistrial than you were. I tell Mr. Duggar [government counsel] I feel he went too far afield, way too far, but based upon the authorities that I have before me at the present time, the motion for mistrial is denied because the only authorities you have pertains to the question of admissibility of evidence and not opening statements of counsel."

Counsel for appellant then stated:

"Our difficulty here, your Honor, is this. Had these things come up

in what I consider the proper order, had he attempted to prove other similar crimes I could then have gotten up and objected. Your Honor could have ruled. The damage would have not been done. The statement being made that they are going to prove such a thing, there isn't any question but that this jury now believes that the Government thinks that he is guilty of 83 crimes in addition to this, plus the fact that he is a burglar."

"The Court: Well, counsel, of course, if you had timely objected and I felt that there was a number of opportunities. I looked down a number of times, surprised that you didn't make any objection under the circumstances.

"Mr. Davis: I tell you, Your Honor, I certainly considered them, but I figured then in my own best judgment that the time was, that the damage was done had I made any objection at that time. The damage was done and I would have been prejudiced with the jury no matter what would have happened from there on."

Following the conferences between court and counsel at the bench, the court stated:

"To save the jurors inconvenience the court has heard matters at the bench, as you well know, prior to the lunch recess and again now. Ladies and Gentlemen of the jury, I hereby instruct you at this time that you are not to consider the statements made by Mr. Duggar in his opening statement pertaining to the commission of other crimes, that may or may not have been committed by this defendant. I instruct you specifically that we only have one issue before the court and jury at this time and that is whether or not the defendant, 'Andrew J. Leonard did, on the date here in question, knowingly, wilfully, and feloniously with intent to defraud the Morrison-Knudsen Company, Inc., transport in interstate commerce between Anchorage, Alaska, and Seattle, Washington, a falsely made and altered security, to-wit: A Morrison-Knudsen Company, Inc., Draft No. 2923 in the amount of $285.01 (and then written out figures) payable to the order of Joe Hill, the said Andrew J. Leonard knowing at the time of transporting said security that it was falsely made and altered: Said draft was negotiated in Anchorage and drawn on the First National Bank of Seattle, Washington.' That is the only issue we have to be concerned with at this time.

"Mr. Davis: If the court please—

"The Court: As the court—just one moment, please, Mr. Davis. As the court instructs you at the close of the trial also an opening statement is like an argument to the jury. It is not evidence. Counsel have the right to make an opening statement both for the plaintiff as well as for the defendant, and likewise to argue the case, but the court specifically instructs you that you cannot consider the arguments and/or the opening statements of counsel as evidence. And your verdict must be determined upon the evidence that is adduced during the course of the trial."

During the course of the trial, which lasted several days, the court ruled that evidence of other crimes alleged to have been committed by the appellant were not admissible in evidence. At the close of the testimony, and prior to the giving of instructions to the jury, the following occurred:

"Now, Mr. Duggar, the court recognizes you.

"Mr. Duggar: Since I have closed the Government's case, and since I did not succeed in introducing the other evidence that I stated in my opening statement, I would introduce, I wish that the court would be good enough to state such fact to the jury that—namely, that it was

occasioned by an adverse ruling the Government suffered in its efforts to introduce such material.

"The Court: Very well, Ladies and gentlemen of the jury, you will recall in the opening statement of the Government he stated that they, the Government, would prove that under the exceptions, and he named those two exceptions, he would be allowed to prove incidents of some 83 other crimes. The court has ruled under the rules of evidence that he may not go into those other crimes. As you have now been apprised he has now asked me to instruct you as to the reason why he has not been able to go into these other crimes. Do you understand that (The jury nod in the affirmative.) Thank you."

Apparently the blackboard cataloging the 83 other crimes alleged to have been committed by appellant and referred to by government counsel in his opening statement remained throughout the trial in the view and presence of the jury. Following the statement by the court to the jury quoted immediately above, the following appears in the record:

"Mr. Davis: Along that line, your Honor, in order that the record may be clear, I would like the record to show that Mr. Duggar's chart concerning these supposed 83 remain in the view of the jury until after the court has ruled on this particular item you have just mentioned.

"The Court: Yes. The court at this time instructs the bailiff to erase those matters. The court further instructed the bailiff to turn the board around after the court ruled on other matters pertaining to these particular facts and the board has been turned around since that time. * * *"

■■ In our view the record hereinbefore set out is more eloquent and convincing than any words of ours in demonstrating that the appellant was denied his constitutional right to a fair trial. For 40 minutes the trial judge sat silently by while the over-zealous prosecutor recounted crimes alleged to have been committed by the appellant, many of which by no stretch of the imagination were admissible to prove intent or identity. The record is clear that the trial judge was aware of the fact that the fair boundaries of an opening statement to the jury were being flagrantly breached, but expected appointed counsel for appellant to object. The court then denied appellant's motion for a mistrial on the ground that appellant had failed to make timely objection. "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Rule 52(b), Federal Rules of Criminal Procedure, 18 U.S.C.A. In large measure the statement made by government counsel was an opening statement in name only. An opening statement should be limited to a statement of facts which the government intends or in good faith expects to prove. It should not be argumentative in character, nor should it be designed to destroy the character of the defendant before the introduction of any evidence on the crime charged in the indictment. In our view the prejudice against the appellant which must have been created in the minds of the jurors by government counsel's diatribe was extremely grave. Such prejudice was not removed by subsequent proceedings.

The admonition given by the court to the jury following the motion of appellant for a mistrial was ineffectual. The court simply advised the jury that counsel had the right to make opening statements but that opening statements and arguments of counsel were not to be considered as evidence. The statement clearly implied that the court regarded the opening statement as proper. If at that time the court was of the opinion that the only offense upon which he would admit proof was the one charged in the indictment, he should have admonished the members of the jury to completely erase and put out of their minds all

statements made by government counsel concerning other crimes and misconduct attributed to the appellant. As this Court stated in Chavez v. United States, 9 Cir., 275 F.2d 813, 818:

> "The law has long recognized the fact that it is difficult when in the courtroom for anyone, juror or not, to disregard that which he has heard. Yet, if evidence is improperly placed before the jury, the least a defendant can expect from the trial judge in correcting the error is a firm, definite, and unequivocal instruction to the jury that it is their duty to disregard it, absolutely and completely, and that it is his opinion they can and must do so."

While the above statement had reference to evidence improperly placed before the jury, it applies with equal force to the opening statement of the character made in the instant case. If the trial judge was of the view at that time that proof of some of the other alleged crimes would be relevant on the issues of intent and identity he should have so advised the jury, and at the same time should have instructed the jury to completely put out of their minds and disregard all statements by government counsel concerning other alleged crimes and misconduct of the appellant, and that it was their duty to do so. By the admonition to the jury the minds of the jurors were conditioned to expect and look forward to proof of all of the crimes and misconduct mentioned in the opening statement.

By the admonition of the trial court given to the jury at the close of testimony the jury was expressly told that the only reason for the failure of the government to introduce proof of the crimes described in the opening statement was occasioned by "an adverse ruling the government suffered in its efforts to introduce such material." Here again was presented an opportunity to the trial judge to instruct the jury that while opening statements of counsel should not be considered as evidence, the members of the jury must absolutely and completely disregard and put out of their minds all statements of other crimes and misconduct contained in the opening statement.

The prejudice occasioned to the appellant by the opening statement was heightened by the fact that the cataloging of such crimes on the blackboard remained as a constant reminder to the members of the jury throughout the trial.

The record in this case demonstrates that government counsel "overstepped the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense." Berger v. United States, 295 U.S. 78, 84, 55 S.Ct. 629, 631, 79 L.Ed. 1314. As stated in the same case at page 88 of 295 U.S., at page 633 of 55 S.Ct.:

> "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.
>
> "It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much

weight against the accused when they should properly carry none."

In view of what has been said, we deem it unnecessary to consider other specifications of error urged by appellant.

The judgment is reversed and the cause remanded with instructions to grant appellant a new trial.