Norman Benjamin PARSON, Defend-
ant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below,
Appellee.

Supreme Court of Delaware.

Feb. 16, 1971.

Carl Schnee and Richard E. Poole, specially appointed defense counsel, and Richard A. Paul, Asst. Public Defender, Wilmington, for appellant.

David P. Buckson, Atty. Gen., Dover, and Peter Warren Green and William Swain Lee, Sp. Deputy Attys. Gen., Wilmington and Georgetown respectively, for the State.

WOLCOTT, C. J., and CAREY and HERRMANN, JJ., sitting.

WOLCOTT, Chief Justice.

This is the second appeal in this cause. In 1964 the appellant, Norman Benjamin Parson, was indicted under 11 Del.C. § 571 for murder in the first degree in that he caused the death of Kathleen Rae Maull while attempting to perpetrate a rape upon her.

At his first trial Parson was found guilty and sentenced to death. He appealed to this court. We affirmed. Parson v. State, Del., 222 A.2d 326 (1966), cert. den. 386 U.S. 935, 87 S.Ct. 961, 17 L.Ed.2d 807 (1967).

Parson thereupon filed a petition for a writ of *habeas corpus* in the United States District Court for the District of Delaware. *Inter alia*, the petition raised the

question of whether or not Parson was competent to stand trial at the time of his conviction. The District Court concluded that there was a substantial question as to whether Parson was competent at the time of his trial, and that the fact of his competency at that time could not be determined some three years later. The District Court therefore required a new trial or release on federal constitutional grounds. United States ex rel. Parson v. Anderson, 280 F. Supp. 565 (1967).

The Superior Court thereafter conducted hearings to determine the competency of Parson and ultimately concluded that he was competent to stand trial. He was thereupon tried again and found guilty without a recommendation of mercy, and sentenced to death. This appeal followed.

The facts are fully set forth in our opinion in the first appeal and will not be repeated here. The facts of the State's case at Parson's second trial do not differ materially from those recited in our first opinion. The State's case is almost entirely circumstantial. Not offered in evidence this time was a lengthy confession by Parson.

Parson raises a number of questions which, it is argued, require a reversal of his conviction and a remand for a new trial. We will consider them *seriatim* in the manner and form in which they are stated in his brief.

### I.

"THE DEFENDANT WAS DENIED DUE PROCESS OF LAW IN THAT THE VOIR DIRE EXAMINATION OF THE PROSPECTIVE JURORS DID NOT MEET THE ESSENTIAL DEMANDS OF FAIRNESS."

11 Del.C. § 3301 provides as follows:

"When a juror is called in a capital case, he shall be first sworn or affirmed upon the voir dire and then asked, under the direction of the Court, if he has formed or expressed any opinion in regard to the guilt or innocence of the prisoner at the bar. If his answer is in the negative, he shall be sworn as a juror in the case, unless he has conscientious scruples against finding a verdict of guilty in a case where the punishment is death, even if the evidence should so warrant him, or unless he shall be peremptorily challenged, challenged for cause, or excused by consent of counsel on both sides. If his answer to the question be in the affirmative, he shall be disqualified to sit in the case, unless he shall say, upon his oath or affirmation, to the satisfaction of the Court, that he feels able, notwithstanding such an opinion, to render an impartial verdict upon the law and the evidence; in which event he shall be a competent juror, if not otherwise disqualified, challenged or excused."

The questioning of 197 prospective jurors upon their *voir dire* occupied some nine and one-half trial days. Of these, 14 were seated as jurymen; 23 were peremptorily challenged, 20 by the defense and 3 by the State; 9 were discharged by the court for personal reasons not relevant to the issues raised here; 23 were discharged for cause by reason of their objections to capital punishment, and 128 were discharged for cause since they conceded having formed an opinion as to Parson's guilt which would have prevented them from reaching an impartial verdict.

■ In Aldridge v. United States, 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931), it was held that the extent of a *voir dire* examination of prospective jurors and the questions to be permitted lay within the broad discretion of the trial judge. The exercise of this broad discretion is nevertheless subject to the essential demands of fairness.

■ The purpose of the *voir dire* examination of prospective jurors is to give the trial judge sufficient information to determine whether or not a prospective juror is qualified. In addition, it aids the

State and the defendant by eliciting facts upon which they can exercise intelligently rights to peremptory challenges. Any limitation imposed by the trial judge upon defendant's right to have prospective jurors questioned will not constitute reversible error unless the broad discretion reposed in the trial judge has been clearly abused to the prejudice of the defendant. State v. Higgs, 143 Conn. 138, 120 A.2d 152 (1956).

The main question is broken down by Parson into three subquestions which we will consider in the order and form in which they are stated in Parson's brief:

"(1) *The Court committed error by interrupting defense counsel's questioning; by questioning the jury, itself; by criticizing defense counsel in open court, and by limiting defense counsel's questioning in crucial areas.*"

We will not review the questioning of each prospective juror but will select typical examples referred to in the Parson brief.

■ The first example called to our attention by Parson is the questioning of a prospective juror who testified that she had formed no opinion concerning the guilt or innocence of Parson. She also testified that she had heard opinions expressed both as to Parson's innocence and as to his guilt. Defense counsel thereupon sought to interrogate her as to the number of opinions of guilt or innocence she had heard. This was objected to by the State and sustained by the trial judge. We think the ruling of the trial court was proper since the only purpose, it seems to us, that the proposed line of interrogation would have served would have been to give factual basis for a renewal of a motion for a change of venue which had previously been denied. It had no pertinency to the qualifications of the prospective juror.

■ The next example was a prospective juror who was asked whether or not he felt that the fact that a prior jury had found Parson guilty would prevent him from reaching an impartial verdict in the case at bar. His answer was, "I would have to see what the evidence was. I mean I haven't heard what the evidence is."

Defense counsel then asked him whether he could disregard the fact that a jury had found Parson guilty. The Court interrupted and refused to permit further questions along that line since it had already been explored. This juror was then peremptorily challenged by the defense.

We think the trial judge was correct in his ruling since there must be practical limitations to *voir dire* examination of prospective jurors. In the absence of limitations, unreasonable delay and frustration in the progress of the trial will result. We see no error in the judge's limitation of the probing of a particular field within the prospective juror's knowledge when that has already taken place.

■ The third example was a prospective juror who testified during questioning by defense counsel that she had an opinion as to his guilt, and that at that moment she could not presume him to be innocent. However, she also said that the opinion she had formed would not prevent her from being an impartial juror and that she could follow and apply the instructions of the court to the effect that every defendant brought to trial is presumed innocent until convicted. Defense counsel moved that she be removed for cause, which motion was denied. She was then peremptorily challenged by the defense.

11 Del.C. § 3301 provides, *inter alia*, that a prospective juror who has formed an opinion as to guilt or innocence shall be disqualified "unless he shall say, upon his oath or affirmation, to the satisfaction of the Court, that he feels able, notwithstanding such an opinion, to render an impartial verdict upon the law and the evidence."

It is apparent that the decision as to whether or not to excuse such a prospective juror for cause rests in the discretion

of the trial judge who must determine from the witness' testimony whether or not he feels that the statement to the effect that she could, despite her opinion, nevertheless render an impartial verdict, was satisfactory. If the trial judge believes the witness' statement, then he may permit the individual to be drawn as a juryman.

We affirm the trial judge's ruling on the basis of 11 Del.C. § 3301, and we note that in other states, irrespective of the existence of a statute to the same effect, similar rulings have been upheld on appeal. Leick v. People, 136 Colo. 535, 322 P.2d 674 (1958) and People v. Duncan, 53 Cal. 2d 803, 3 Cal.Rptr. 351, 350 P.2d 103, appeal dismissed Baldonado v. California, 366 U.S. 417, 81 S.Ct. 1355, 6 L.Ed.2d 380 (1960).

It seems to us Parson's position is that if a prospective juror has ever held an opinion as to guilt or innocence, he is forever disqualified from sitting in that case. Such, however, is not the law. The question is whether or not, irrespective of a prior opinion, the prospective juror can follow the instructions given by the trial judge, disregarding his prior opinion and deciding the issue of guilt or innocence upon the facts presented in the trial at bar.

■ Defense counsel also criticizes the rulings of the trial judge on the ground that they criticized defense counsel in the presence of prospective jurors. They also charge that he forcefully instructed the prospective jurors that they simply could have no opinion as to Parson's innocence or guilt. It is argued that these rulings effectively eliminated the usefulness of the voir dire.

We think, however, defense counsel overstates what the trial judge did. Actually, the trial judge limited the examination to the determination of whether or not, despite a prior opinion, the prospective juror could in fact render an impartial verdict. If he could, then the motion to challenge for cause was denied and, in so doing, we think the trial judge was correct.

"(2) The trial court committed reversible error in not excusing for cause certain veniremen who stated that they would tend to believe the testimony of a police officer more readily than that of a lay-witness."

■ Parson refers to the examination on voir dire of three prospective jurors, two of whom were actually seated on the jury and one of whom was challenged peremptorily by Parson. All three prospective jurors testified in substance that they would tend to believe more readily a police officer when he is testifying as to matters for which he is trained, and which he learned about in the course of the performance of his duty. All of them, however, testified that if the testimony concerned was not directly related to or growing out of the performance by the policeman of his duties as an officer, they would treat his testimony as that of any other witness. Parson challenged all three for cause and each challenge for cause was denied.

Parson relies upon Sellers v. United States, 106 U.S.App.D.C. 209, 271 F.2d 475 (1959) and Brown v. United States, 378 F.2d 543 (D.C.Cir. 1964) in support of his argument. The two cited cases, however, do not support the argument. These two cases held that it was reversible error not to allow the questioning of a prospective juror upon the subject of whether or not he would give greater weight toward policemen's testimony. The cases do not rule upon the question of whether or not witnesses answering in the affirmative should be excused for cause. In point of fact, the questions were allowed in the case at bar and, therefore, there is no violation of the holding in the Sellers and Brown cases.

All three of the prospective jurors testified that, irrespective of their answers to the questions, they nevertheless could give an impartial verdict based upon the evidence produced at trial.

We find no error in the refusal of the trial judge to dismiss the three prospective

jurors for cause. Gorin v. United States, 313 F.2d 641 (1st Cir. 1963), cert. den. 374 U.S. 829, 83 S.Ct. 1870, 10 L.Ed.2d 1052.

"(3) *The trial court committed numerous other errors in the conduct of the voir dire.*"

The numerous other errors referred to are that defense counsel was not permitted to question prospective jurors as to the general opinion in the community concerning Parson; that defense counsel was unduly limited by the trial judge in their questioning of prospective jurors as to the presumption of innocence; that defense counsel was unduly limited by the trial judge in their questioning of prospective jurors concerning the opinions of others as to Parson's guilt of which the prospective juror was aware; that defense counsel was unduly limited by the trial judge in their questioning of prospective jurors as to whether or not they would be automatically prejudiced against someone who overindulged in the use of alcohol, and that the trial judge misled defense counsel as to whether the circumstantial evidence rule should be included in the *voir dire* questioning.

■ We think all, or at least most, of these objections have been covered by the preceding rulings. We think, also, the objections under this subquestion lose sight of the purpose of a *voir dire* examination of prospective jurors. As we have said, the purpose of such examination is solely to determine whether the prospective juror can render an impartial verdict upon the evidence and the law. Any questions which go beyond the ascertainment of this ultimate fact are entirely irrelevant to the *voir dire* examination and are properly struck by the trial judge.

We find no error committed by the trial judge who had the advantage over us of seeing and hearing the testimony of the prospective jurors and was therefore more able to determine their impartiality and ability to render an impartial judgment. On the record before us, we hold that there was no abuse of his discretion in the denials complained of.

In concluding this facet of the case, in which it took nine and one-half days to draw the jury, we state our concern regarding the recent practice of permitting *voir dire* examination of prospective jurors directly by counsel rather than by the trial court, as heretofore. We think the present trend toward a more prolix *voir dire* examination of prospective jurors by counsel must be brought under control in this State before it grows into the disgraceful practice we have seen elsewhere, often taking more trial days to select the jury than it does to try the case.[1] Too often we see the *voir dire* process being misused to argue the case, to indoctrinate the jury, and to seek other undue advantage.

We caution against *voir dire* examination of jurors at inordinate length and on questionable and irrelevant matters. We do so without casting any reflection upon counsel in the instant case. The recent tendency to indulge in *voir dire* examination of a prolixity heretofore unknown in this State, with its trial delays and its adverse effect upon already heavily-burdened trial courts, requires that restrictive guidelines should be imposed forthwith for tighter control of the jury-drawing process.

■ The matter is governed in this State by Superior Court Criminal Rule

---

1. The evil we here criticize is not a present-day creation. Four decades ago, the length and prolixity of *voir dire* examination moved Judge Learned Hand to say that it "had become a scandal, and required some effective control." Falter v. United States (2 Cir.) 23 F.2d 420, 426 (1928). And seven decades ago, the Chief Justice of New Jersey referred to the "unseemingly, vexatious, and expensive delays in impaneling juries in criminal cases which have been a reproach to the administration of criminal justice in some other states." Clifford v. State, 61 N.J.L. 217, 39 A. 721 (1897).

24(a)[2] which is the same as Federal Criminal Procedure Rule 24(a) from which our rule was taken. We are of the opinion that as a general rule, in the exercise of the discretion vested in him by Rule 24(a), the trial judge should reserve to himself the function of interrogating prospective jurors upon *voir dire* examination as heretofore; provided, however, that reasonable opportunity be accorded to counsel to submit to the trial judge requested questions to be asked the prospective jurors, to be accepted or rejected by the judge in the exercise of a sound judicial discretion. By so doing, abuse of the process will be avoided, time and money will be saved, the burden on the trial courts will be somewhat relieved, and the true purpose of the *voir dire* examination will not be subverted. A return to the prior practice in this State will conform our practice to that prevailing in most federal courts [see Kerr, "Empaneling of a Jury", 28 F.R.D. 37, 185, 188 (1962)] and in most state courts [see extensive discussion in State v. Manley, 54 N.J. 259, 255 A.2d 193, 200 (1969)].

## II.

"THE CONDUCT OF THE VOIR DIRE EXAMINATION AS IT RELATED TO THE QUESTION OF CAPITAL PUNISHMENT HAS DENIED DEFENDANT DUE PROCESS OF LAW IN THAT IT VIOLATED THE STANDARDS SET FORTH IN WITHERSPOON v. ILLINOIS."

■ Under this assignment of error Parson relies upon Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, Boulden v. Holman, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 and Maxwell v. Bishop, 398 U.S. 262, 90 S.Ct. 1578, 26 L. Ed.2d 221. These three decisions of the Supreme Court of the United States lay down the rule that a "sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Under the rule of these cases, no prospective juror may be excused for cause because of conscientious objections to the imposition of the penalty of death unless he states unambiguously that he would vote automatically against a verdict of guilty involving the imposition of the death penalty, no matter what the evidence at trial might be. We understand the *Witherspoon* rule to be that if, irrespective of his scruples, a juror nevertheless will return a verdict in accordance with the evidence, he may not be excused for cause from serving on the jury.

■ In the case at bar, a number of prospective jurors were excused by the trial judge for cause by reason of their stated views against capital punishment. We have examined the transcript of the *voir dire* examination of these prospective jurors and are of the opinion that in all instances they clearly indicated that their scruples against the imposition of the death penalty were such as to prevent them from voting impartially upon the evidence presented upon a verdict of guilty or innocent. In other words, we are convinced, as we believe the trial judge was, that these particular individuals under all circumstances would have refused to have returned a verdict of guilty in view of their

**2.** Superior Court Criminal Rule 24(a) provides:

"(a) Examination. In addition to any examination required by statute, the court shall permit or conduct such examination as is reasonably calculated to ascertain prejudice of a juror. The court may permit the defendant or his attorney and the Attorney General to conduct the examination of prospective jurors or may itself conduct the examination. In the latter event the court shall permit the defendant or his attorney and the Attorney General to supplement the examination by such further inquiry as it deems proper or shall itself submit to the prospective jurors such additional questions by the parties or their attorneys as it deems proper."

opposition to the imposition of the penalty of death.

We think that the trial judge who saw the demeanor of the prospective jurors on the stand and heard their testimony was entirely within the limits of his discretion in excusing them for cause under the circumstances disclosed by that examination.

We therefore find no error in the rulings of the trial judge in excluding these particular prospective jurors for cause.

### III.

"THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO GRANT A CHANGE OF VENUE IN THAT THERE WAS A REASONABLE LIKELIHOOD THAT DEFENDANT COULD NOT RECEIVE A FAIR TRIAL IN SUSSEX COUNTY."

Parson moved for a change of venue prior to trial on the ground that he could not receive a fair trial in Sussex County. This motion was denied and thereafter renewed during the *voir dire* examination of the jurors. The motion was again denied.

Rule 21(a) of the Superior Court Criminal Rules provides that upon motion of a defendant, the court shall transfer the proceedings to another county if the court is satisfied that there is so great a prejudice against the defendant in the county where the case is pending that he cannot obtain a fair and impartial trial in that county. This rule has been promulgated to comply with the requirement of the Sixth Amendment of the Federal Constitution that in all criminal prosecutions, an accused has a right to trial by an impartial jury.

The main thrust of Parson's argument under this point is that the pretrial publicity, both by newspaper and radio broadcasts, necessarily created a deep-rooted prejudice in the minds of the residents of Sussex County, and that, therefore, he cannot obtain a fair and impartial trial by a jury in that county. As proof of this existing prejudice, he points to the fact that 78% of all the prospective jurors fully questioned on *voir dire* examination admitted that they had already formed an opinion as to the defendant's guilt and were accordingly discharged by the court for cause.

Parson points to the existence of the alleged prejudice, the brutality of the crime, the unsavory sexual implications attendant upon the circumstances, the racial overtones and the geographic and social structure of the county in which the case was tried, as requiring the application of the rule laid down in Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) to the effect that excessive adverse and prejudicial pretrial publicity in a case may require a change of venue.

An Annotation in 33 A.L.R.3rd 17, collects an extensive number of cases upon the entire subject. It appears from this Annotation that in order for a defendant to successfully obtain a change of venue, he must necessarily show that pretrial publicity has created such a feeling of prejudice and bias against him in the community that his right to a fair trial has been put in jeopardy. In § 3(b) of the Annotation, it appears that the general rule, almost without exception, is that routine pretrial publicity disseminated about a criminal case will not *per se* force the grant of a motion for change of venue. In addition, other evidence as to the unlikelihood of a fair trial must be presented. Collected, also, are cases following this general rule, even though the pretrial publicity was accusatory, denunciatory or inflammatory.

The only additional evidence offered by Parson is that 78% of the questioned jurors were excused for cause by reason of the fact that they had formed an opinion as to his guilt. This fact alone, however, is not sufficient to turn the balance in favor of the defendant's motion for a change of venue. People v. Speck, 41 Ill.2d 177, 242 N.E.2d 208 (1968). In the *Speck* case, in excess of 250 prospective jurors were

excused for cause and, yet, it was held that that alone did not show prejudice in the county against the defendant to the extent that he could not receive a fair trial. We point out that in the first appeal of this cause, 222 A.2d 326, a similar argument was made to us, viz., that it was reversible error to deny Parson's application for a change of venue. In that first appeal, we held that the denial of a change of venue was not reversible error and affirmed the conviction. We pointed out that the newspaper coverage in advance of his first trial was co-extensive with all three counties of the State. Of significance, also, we thought was the lapse of almost a year between the crime and the trial which must have had the effect of lessening, to some extent, any reactions of outrage at the shocking crime.

Parson's second trial took place more than five and-a-half years after the commission of the crime, and the publicity incident thereto.[3] Consequently, the emotional impact of a brutal crime and the publicity it generated must have lessened even more. It cannot be expected that prospective jurors called to sit in a sensational trial will not have formed some opinion, at least, about a crime which has received front-page coverage throughout the State. It would be useless, we think, to expect the northernmost county of the State, which receives the same news media as Sussex County, to be free of any opinion concerning the crime itself. The most a defendant has a right to expect in a case where there has been extended press coverage is that the jurors selected for his trial will have the ability and fairness to put aside their opinions previously formed, and reach a verdict based on the evidence presented to them in open court. Irvin v. Doud, 366 U.S. 717, 724, 81 S.Ct. 1639, 6 L.Ed.2d 751.

We accordingly reach the same conclusion as in the first appeal, that the denial of a change of venue, which is a discretionary act with the trial judge, did not constitute reversible error because there was no abuse of discretion.

### IV.

"THE DEFENDANT'S GENUINE PSYCHOGENIC AMNESIA RENDERED HIM INCOMPETENT TO STAND TRIAL."

In connection with the argument made under this heading, Parson's counsel recites a long history of his sexual deviate behavior and his mental instability. However, no plea of insanity was offered as a defense. The point actually comes down to the question of Parson's competency to stand trial in view of his amnesia, which the psychiatrists and psychologists who examined him apparently agree is genuine and not feigned. The period of amnesia asserted by Parson extends to several hours before the commission of the crime, and to a point several hours after his arrest and examination by the police. With the exception of this period, Parson's memory is clear. He, however, claims to have no memory whatsoever of the actual events immediately preceding, during and immediately following the commission of the crime.

3. We deplore the long delay in the prosecution of this case. This crime was committed on January 31, 1964, and over seven years have now elapsed. The opinion in the first appeal to this Court was filed in July 1966; and the Supreme Court of the United States denied certiorari early in 1967. The almost four years elapsed since have been taken up by the Federal Court proceedings, the second pretrial proceedings, trial and this appeal. And further proceedings in the Federal Courts may be expected. We do not point the finger at counsel, or at medical witnesses, court reporters or other courts. Much of the fault lies in the system. We simply take the occasion to say that it is this kind of delay in the prosecution of criminal cases that has brought justified public criticism upon the courts and the administration of justice, and we strongly urge all concerned to minimize such delays in the future in every possible way.

The trial judge held a hearing and after considering the testimony of the psychiatrists and psychologists, ruled that Parson was competent to stand trial under the tests laid down in the reported decisions.

In Reagon v. State, 251 N.E.2d 829 (Ind. 1969), a divided court pointed out that the question raised by the existence of amnesia as to the actual events of the crime is not that of a defense to the criminal charge, but is merely something to be considered in determining whether or not the defendant is competent to be tried for the offense charged. The test is whether or not he has the capacity to comprehend his position, to understand the nature of the proceedings against him, to conduct his defense in a rational manner, and to cooperate with his counsel in making any available defense to the charge.

In Wilson v. United States, 129 U.S. App.D.C. 107, 391 F.2d 460 (1968), it was held that a criminal defendant is entitled to a fair trial and that to have a fair trial he must be competent to stand trial. The test of competency was stated to be whether or not the defendant has sufficient present ability to consult with his lawyer rationally and whether he has a rational as well as factual understanding of the proceedings against him.

■ The *Wilson* case sets forth six guidelines to be utilized in determining competency when amnesia concerning the circumstances of the crime is the fact. These guidelines are as follows:

1) The extent to which the amnesia affects his ability to consult with his lawyer;

2) The extent to which the amnesia affects the defendant's ability to testify in his own behalf;

3) The extent to which the evidence in the suit could be extrinsically reconstructed in view of the defendant's amnesia including evidence relating to the crime itself, as well as any reasonably possible alibi;

4) The extent to which the government assisted the defendant and his counsel in that reconstruction;

5) The strength of the prosecution's case; that is, whether it is such as to negate all reasonable hypothesis of innocence. In this connection, if there is any substantial possibility shown by the evidence that the accused could, but for his amnesia, establish an alibi or other defense, then it should be presumed that he would have been able to do so; and

6) Any other facts and circumstances which would indicate whether or not the defendant had a fair trial.

■ We think it is clear from the record before us that Parson was able to consult with and assist his lawyer subject to the limitation imposed by his claimed amnesia. Furthermore, the prosecution's case against Parson consisted almost entirely of circumstantial evidence which left no reasonable hypothesis but guilt when considered in its entirety. Moreover, Parson, by the circumstantial evidence, was so tightly tied to the actual commission of the crime that any prospect of the defense of alibi is nonexistent.

Under the guidelines laid down in the *Wilson* case, which we think fairly reflects the general law on the subject, it is clear that despite his claimed amnesia with respect to the actual commission of the crime, itself, Parson was competent to stand trial. The trial judge, therefore, committed no error in so holding.

■ Finally, in this connection, Parson argues that his amnesia destroyed his ability to present circumstances to the jury which might have resulted in a recommendation of mercy pursuant to 11 Del.C. § 3901. The argument is that any attempt to show Parson's past history, his sexual deviation and his mental instability would have created in the minds of the jury a strong inference of guilt and that, therefore, there should have been a separate and

subsequent finding on the question of punishment following a verdict of guilty.

It is argued that in an attempt to preserve Parson's life through a jury's recommendation of mercy, evidence was presented by his counsel concerning his mental impairment. It is said that this essential evidence at the same time unavoidably poisoned the jury's objectivity since, from it, flowed a strong inference of guilt. Furthermore, the decision not to present evidence concerning Parson's past sexual activity was made because necessarily such evidence lent itself to a conclusion that his life would have followed an inevitable course to a sex crime, even though the precise crime being tried had not been committed.

All of this may be true, but it is also true in any or most criminal prosecutions. Mitigating evidence offered in behalf of the defendant oftentimes may have the opposite effect upon the jury than that for which it is intended. This may be an unfortunate situation, but it is nevertheless one of the facts attendant upon a criminal prosecution. Therefore, it is not error to refuse to depart from law of long standing in this State that the question of guilt and of mercy are to be tried together before the same jury.

## V.

"THE COURT ERRED IN REFERRING IN ITS CHARGE TO EVIDENCE OF APPELLANT'S AMNESIA INASMUCH AS AMNESIA IS NOT AN AFFIRMATIVE DEFENSE."

We think there was no error in the reference to Parson's amnesia in the instructions given by the trial judge to the jury. As a matter of fact, the instruction was given not for the purpose of enabling the jury to resolve the issue of guilt or innocence. The jury was specifically instructed that it could not be used for that se but was introduced as a circum- solely for the consideration of the

jury in determining the penalty. In other words, it related to the issue of whether or not the jury should recommend mercy after having found the defendant guilty. There was no error in this inclusion in the charge.

## VI.

"THE LOWER COURT ERRED IN ADMITTING THE INVOLUNTARY STATEMENTS MADE BY PARSON AT THE SCENE OF THE ARREST."

Two oral statements by Parson are involved in this assignment of error. The circumstances were that after the police had been called to the scene of the crime, they stopped vehicles going by on the road. From the driver of one of them, they learned that Parson's car, which the driver had recognized, had been seen by him earlier in the evening parked in front of the scene of the crime. Thereupon, two state troopers proceeded to Parson's home and found there his car parked with Parson in it. Parson was ordered to get out and the troopers noticed that he was bleeding profusely from one hand. At this point, Parson, who recognized one of the troopers, made the first of the oral statements as follows: "Mr. Purdy, I am in a mess of trouble."

After this statement, Parson was handcuffed and a tourniquet applied to his arm. In the course of this, a state police detective arrived and, noticing blood over the trunk of Parson's car, reached in the car and removed the keys from the ignition and approached the trunk as though to open it. At this point, Parson made the second of his two oral statements as follows: "She is not in there. She is in a ditch. I will show you where."

These two oral statements made by Parson were offered and admitted in evidence. They were the only statements made by Parson which were offered and admitted into evidence. Parson argues that since they are the only direct verbal testimony from him to link him to the crime, the ef-

fect of the statements upon the jury must be considered to have been enormous. We think this is undoubtedly correct.

We think, however, that the admission into evidence of the two statements was not error. We observe that the statements were voluntarily made and not in answer to any police interrogation. Rather, we think, they were spontaneous statements by a man who was conscious of what he had done and were not induced by anything the police did or said.

There was no error in their admission into evidence.

## VII.

"THE LOWER COURT ERRED BY ADMITTING AS EVIDENCE THE FINGERNAIL SCRAPINGS, THE PUBIC HAIR COMBINGS AND THE BLOOD SAMPLE TAKEN FROM PARSON BECAUSE THEY ALL WERE PRODUCTS OF SEARCHES WHICH VIOLATED DUE PROCESS."

█ The facts surrounding the accumulation of this evidence are as follows:

Parson, after taking the police to the ditch where the body of the victim was found, was taken to the Beebe Hospital in Lewes and there given treatment for the cut on his arm. He was taken from there to the police station near Georgetown where he was questioned and gave as a matter of fact a lengthy written statement as to the circumstances of the crime. This statement was not offered in evidence. Following the taking of the statement, Parson signed a written permission to have a blood sample taken, he consented to have his fingernails scraped and he, himself, actually took the pubic hair combings. Parson, at the time, was in police custody and the police investigation had long passed the accusatory stage. Parson was the suspected person, was in police custody, and to all intents and purposes under arrest.

Parson cites in support of his argument United States v. Townsend, 151 F.Supp.

378 (D.C.1957) and State v. Wolf, 3 Storey 88, 164 A.2d 865 (1960). We think, however, the two cases do not aid his argument. In the *Townsend* case the defendant was charged with rape and was in the police station where he apparently was bleeding from blows allegedly inflicted by the police. Thereafter, blood was obtained, over his protests, by scrapings from his pubic hair and this evidence was rejected. However, it appears that perhaps the main reason for the rejection of the blood sample was that there was no proof of where the blood came from. It may have come from the cuts from which the defendant himself was bleeding, or it may have come from the victim of the rape. In any event, we think the case is not persuasive in the matter before us.

Similarly, the *Wolf* case is of no aid to Parson. In it, a blood sample taken from a defendant while he lay unconscious in a hospital was ordered suppressed as having been obtained in violation of Article I, § 6 of the Delaware Constitution, and of 11 Del.C. §§ 2301 and 2303. Those two Code sections permit the search of a person or place in the absence of a warrant without consent if it is made as an incident of a lawful arrest.

We think rather the question is controlled by Schmerber v. California, 384 U. S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) and Brent v. White, 5 Cir., 398 F. 2d 503, cert. den. 393 U.S. 1123, 89 S.Ct. 998, 22 L.Ed.2d 130 (5th Cir. 1968).

This evidence was obtained from searches of the person of Parson as incident to a lawful arrest or a keeping in custody. They were consented to by Parson and there is no evidence whatsoever that any form of coercion was used to force him to consent. As a matter of fact, in the case of the pubic hair, he not only consented but performed the combing himself.

There was no error in the admission of this evidence.

## VIII.

"ERROR WAS COMMITTED BELOW WHEN THE STATE, IN ITS OPENING STATEMENT, INDICATED THAT IT WOULD PROVE FACTS WHICH IT SUBSEQUENTLY FAILED TO OFFER INTO EVIDENCE."

 In his opening statement, the prosecutor told the jury that in the house where Kathleen Maull was baby-sitting was found her pants and other parts of her clothing; on the back porch was found her watch, and near the highway her blouse was found. The State thereafter did not follow up this statement and offer the items mentioned into evidence.

Parson claims the failure of the State to follow up the prosecutor's opening statement with the production of evidence constitutes reversible error. Cited are People v. Luberto, 212 App.Div. 691, 209 N.Y.S. 544 (1925); Leonard v. United States, 277 F.2d 834 (9th Cir. 1960), and Herhal v. State, 243 A.2d 703 (Supr.Ct.Del.1968).

We think the *Lobards* case is entirely different from the one before us. In that case in an opening statement the prosecutor apparently referred at length to a confession which had been made by the defendant. Thereafter, the State did not offer to introduce into evidence the confession. This was held to be reversible error.

In the *Leonard* case the prosecutor in his opening statement read the defendant's prior record, including some 83 charges. No evidence was offered at trial to follow up this statement and the conviction was reversed.

In the *Herhal* case, in opening to the jury the prosecutor stated that the State would prove that Herhal approached the homicide victim in a sexual vein, was rebuffed as he had been rebuffed earlier in the day by other women, and that he became enraged and chased the victim, caught her and killed her. The prosecutor also stated that Herhal habitually carried a knife and that it would be indicated by the evidence that he killed the victim with the knife he carried, and that he later disposed of the knife. No evidence was offered in support of these statements. We considered the quoted statements to be so far into the realm of speculation and conjecture that the jury may have been misled to the prejudice of the defendant, and directed a new trial.

In the case at bar we think the statement made by the prosecutor in his opening remarks could not possibly have prejudiced the defendant Parson. The circumstances proved by the State conclusively showed the attempted rape, the homicide in the course of it, and the connection of Parson to it. The actual introduction into evidence of the clothing worn by the victim at the time would have added little to the State's case against Parson.

If, therefore, it was error for the State not to have followed up its opening statement, it was harmless error.

## IX.

"A. THE DEFENDANT HAS BEEN DENIED DUE PROCESS OF LAW IN THAT THE JURY HAS THE POWER TO IMPOSE EITHER THE DEATH PENALTY OR LIFE IMPRISONMENT WITHOUT BEING GIVEN ANY STANDARD OR DIRECTION BY THE COURT."

"B. THE IMPOSITION OF THE DEATH PENALTY CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT."

 The above two issues are raised again by Parson in this second appeal in order to preserve his position; but since, in one form or another, the questions are currently pending before the Supreme Court of the United States, no separate argument is made in Parson's behalf. In view of this position, we limit this opinion

to the statement of our rejection of these contentions. We will not discuss the questions. We note, however, that these questions have been fully argued before us and are considered in the opinion handed down simultaneously with this opinion. Steigler v. State, 277 A.2d 662 (1971).

The conviction below is affirmed.