Judith McBRIDE, Defendant-Appellant,

v.

STATE of Delaware, Plaintiff-Appellee,

and

Gannett Co., Inc. and Jane Brooks,
Intervening Appellees.

Supreme Court of Delaware.

Submitted: April 18, 1983.
Decided: March 2, 1984.

Gerald I. Street (argued) and Henry du-Pont Ridgely (argued), Dover, for appellant.

Gary A. Myers (argued), Deputy Atty. Gen., Georgetown, and James E. Liguori, Deputy Atty. Gen., Dover, for appellee.

Richard G. Elliott, Jr. (argued) and L. Susan Faw, Richards, Layton & Finger, Wilmington, for intervening appellees Gannett Co., Inc. and Jane Brooks.

Before HORSEY, MOORE and CHRISTIE, JJ.

HORSEY, Justice:

Defendant, Judith A. McBride, seeks reversal of her convictions in a jury trial of Murder in the First Degree (11 *Del.C.* § 636(a)(1)) and of Conspiracy in the First Degree (11 *Del.C.* § 513(2)) in the death of her husband, William A. McBride, Jr. In a separate punishment hearing under 11 *Del.C.* § 4209, the same jury declined to impose the death penalty upon defendant. As a result, defendant received a mandatory sentence of life imprisonment without benefit of probation or parole. For the conspiracy conviction, defendant was sentenced to a consecutive term of ten years' incarceration. On appeal, defendant asserts multiple grounds for reversal, all but one of which involve claims of denial of procedural due process or fair trial. We find no reversible error and therefore affirm.

\* \* \*

The State's evidence presented at trial was as follows: On April 14, 1980, William

A. McBride, Jr. was stabbed to death in his "bachelor's" apartment near Dover. His naked body was found floating face down in a bathtub half-filled with water. He had been stabbed 27 times—10 times in the face and 17 times in the body. There was evidence of a violent and bloody struggle but no evidence of a forced entry.

At time of death, McBride, 45 years old, and defendant, 34 years old, had been separated for three months. Defendant had also filed for divorce. The parties had been married only two years. Each had prior marriages and children by them. There was one child of their marriage, a handicapped boy suffering from cerebral palsy and confined to a wheelchair.

McBride was killed by Frank L. Ross.[1] Ross, 23 years old, had recently arrived in Dover via Florida in search of work. Ross came to Dover at the urging of Robert Kreider, age 37, of Dover. Kreider told Ross he could live with him; but when they returned to Dover in January, 1980, Kreider found his house uninhabitable. Kreider then turned to defendant for assistance. Kreider had known defendant for several months and the two of them had dated while McBride and defendant were still living together.

Early in January, McBride and defendant had separated; and defendant had been heard to say, "I will see that son-of-a-bitch [McBride] dead." Shortly thereafter, Kreider moved in with defendant and Ross joined them, as "roomers." A third roomer was June Davis, a close friend of defendant. The household also included defendant's two children by a previous marriage and her handicapped son by McBride. The principal topic of conversation between defendant and her roomers was defendant's hatred of her estranged husband. Kreider and Davis were already well aware of defendant's animosity for her husband and of her desire to see him dead. According to Davis, McBride had repeatedly said she

wanted her husband killed and she would ask anyone to do so. Defendant had previously asked Kreider to help her kill her husband; but Kreider had been noncommittal before his trip to Florida.

Defendant had been similarly rebuffed in her efforts to solicit others to kill her husband. The previous summer, defendant had made two abortive attempts to secure a hired killer. One involved an offer by defendant to pay the son of one of her female friends $1,200 of insurance proceeds if he would kill her husband. Defendant had also informed the spouse of a co-worker that if he "knocked off" her husband, she would make it worth his while by paying him. When asked if defendant wasn't joking, defendant replied, "She was serious, she wasn't kidding."

More recently, and before their separation, defendant had attempted to carry out the deed with the assistance of her friend, Davis. The plan, as conceived by them, involved defendant's putting Valium and sleeping pills in her husband's food while Davis hid in the attic of McBride's house. After her husband became unconscious, they would place McBride in a filled bathtub to drown under circumstances that would look like an accident. The plan was carried out but backfired when McBride, even though drugged, failed to lose consciousness. After that plan failed and while Kreider was in Florida, defendant approached a local bar owner whom she knew and asked him if he knew of anyone who would kill for money.

From defendant, Ross heard lurid tales charging her husband with wife-beating and sexual abuse as well as cruel or inhuman treatment of their handicapped child. Ross became incensed ("hyper") over McBride's mistreatment of his wife and family; and defendant, aware of the impression she had made upon Ross, turned to him to do the deed. By then, Ross and Kreider had learned of defendant's previ-

---

1. Ross was also indicted for first degree murder in the death of McBride and has been separately tried and found guilty as charged. He, too, was sentenced to life imprisonment by the sentencing jury. Ross' appeal is now pending before this Court.

ously bungled attempt to drug her husband and drown him in a bathtub.

Over a three month period, defendant and her "roomers", primarily Ross and Kreider, considered six or seven different schemes for killing McBride under circumstances that would make his death appear to be an accident. After two efforts to stage an assault by an unknown assailant (Ross) upon McBride failed, they then decided to re-enact defendant's first attempt on her husband's life.

On April 14, 1980, defendant drove to her estranged husband's apartment with a macaroni salad, her husband's favorite, laced with Valium. After eating the macaroni and having sexual intercourse with defendant, McBride fell asleep. Defendant then telephoned Ross to come to McBride's. On Ross' arrival, defendant let him in the apartment and filled the bathtub with water. Defendant then placed an empty Valium bottle on her husband's nightstand and wrote a note to indicate that when she left her husband had fallen asleep. As defendant went out of the apartment, she heard her husband scream.

Defendant, unable to get her car started, waited until Ross left the apartment. When Ross came out, he told her, "It's over." Defendant drove home while Ross chose to walk. When Ross later arrived home, defendant asked Ross whether her husband was dead and in the bathtub. Ross answered that he was. The next day, before McBride's body was discovered, defendant twice telephoned a friend of her husband to inquire as to his whereabouts. The following day, after McBride's body was discovered by the police, defendant suggested that her husband's son or his former wife should be considered suspects. Defendant professed ignorance as to the cause of her husband's death.

Two weeks later, Judith McBride and Frank L. Ross were arrested and charged with the death of McBride's husband. After waiving preliminary hearings, McBride and Ross, in June, 1980, were each indicted for Murder in the First Degree as well as other offenses. In September, 1981, Ross was separately tried before a jury in Superior Court, Kent County, found guilty as charged, and ultimately sentenced to life imprisonment without benefit of parole. In March, 1982, nearly two years after arrest, Judith McBride's case went to trial before a jury in Superior Court, Kent County, and after a 12-day trial, she, too, was convicted of first degree murder as well as the above-mentioned offenses.

\* \* \*

Defendant asserts seven grounds for reversible error. We take them up in essentially the order in which they occurred at trial.

I

On September, 1980, the News-Journal, a Gannett-owned paper (hereafter "Gannett"), published an interview of co-defendant Frank Ross by reporter Jane Brooks entitled, "Bathtub Murder Began As A Game, Suspect Says." The article recited Ross' role in the murder of McBride and implicated both defendant and Kreider. Two weeks later, defendant moved under Superior Court Rule 17(c) that a subpoena *duces tecum* be issued requiring Brooks and the News-Journal to produce within 30 days for inspection by defendant "all notes, letters, recordings, documents or any other evidence of any other statements made by Frank L. Ross." Defendant's sole ground for so moving was: that inspection of the requested documents was needed to permit defendant to attack *at trial* the credibility of Ross; that there were serious inconsistencies between what Ross had previously told the police and what he had apparently told Brooks concerning the role of the defendant and Kreider in the slaying; and that Ross' credibility was "crucial and perhaps determinative" of the outcome of defendant's trial. Defendant's motion, being unopposed, was granted and subpoenas were served upon Brooks and the News-Journal Papers.

Gannett and Brooks promptly moved to quash the subpoena on the ground that the unpublished materials, though not confidential, were protected from compulsory production under the First Amendment of the United States Constitution and Article I, § 5 of the Constitution of the State of Delaware. Following briefing and oral argument, the Trial Court ordered the subpoena quashed for failure of defendant to show that the requested material was not "readily available from other sources." The order to quash was entered in May, 1981.

At defendant's trial in March, 1982, co-defendant Ross was called as a prosecution witness and, after answering two preliminary questions,[2] refused to respond further, claiming his Fifth Amendment privilege against self-incrimination. The Trial Court ruled that Ross had waived his privilege by testifying in his own defense at his trial. However, Ross refused to give any further testimony; defendant did not seek to cross examine Ross; and defendant did not renew her motion for issuance of a Rule 17(c) subpoena directed to Brooks and Gannett.

On appeal, defendant alleges reversible error in the Court's quashing of the pre-trial subpoena on First Amendment grounds.[3] Defendant contends that the Court thereby violated her right to due process and her Sixth Amendment right to compulsory process for obtaining witnesses.

We find it unnecessary to reach either the Sixth Amendment question raised by defendant or the First Amendment privilege claimed by intervenors Gannett and Brooks.[4] We conclude that the issue must be resolved against defendant on other grounds. *In re McGowen*, Del.Supr., 303 A.2d 645 (1973); *Downs v. Jacobs*, Del. Supr., 272 A.2d 706 (1970).

■ Superior Court Rule 17(c) is not a pre-trial discovery rule that may be used for the production and inspection of statements of prospective witnesses. *State v. Hutchins*, Del.Super., 138 A.2d 342 (1957), *aff'd on other grounds*, Del.Supr., 153 A.2d 204 (1959).[5] In *Hutchins*, Judge Herrmann, now Chief Justice, barred use of Rule 17(c) by defendant for pre-trial production and inspection of documents possessed by the State, including written statements of prospective witnesses expected to testify at trial. The statements were requested by defendant to permit "advance preparation for impeaching of the witness if called by the State." In denying the motion, then Judge Herrmann relied on federal authorities for guidance in construing the interrelationship of Federal Crimi-

---

2. Ross testified as follows:
 Q. ... Do you know Judith McBride?
 A. I would assume that is the lady you have sitting in the hot seat.
 Q. Do you know Robert Kreider?
 A. Yes, he is the gentleman that planned this whole thing and now he's getting a plea bargain to testify against Judith McBride.
 Q. Did you kill Bill McBride?
 A. Due to the advice of my attorney, I plead the Fifth Amendment from this point.

3. The Trial Court based its ruling solely on First Amendment principles. The Court ruled that defendant had not met her burden of proof for overcoming the First Amendment qualified privilege of a news gatherer against disclosure of unpublished materials. *Riley v. City of Chester*, 3d Cir., 612 F.2d 708 (1979); *U.S. v. Cuthbertson*, 3d Cir., 630 F.2d 139 (1980); *U.S. v. Criden*, 3d Cir., 633 F.2d 346 (1980).

4. For the same reason, we do not reach related questions concerning the extent of Delaware's recognition of a First Amendment privilege under Delaware Uniform Rules of Evidence 513 and 501 and the Reporter's Privilege Act, 10 *Del.C.* §§ 4320–26.

5. Superior Court Criminal Rule 17(c) provides:
 (c) *For Production of Documentary Evidence and of Objects.* A subpoena may also command the person to whom it is directed to produce the books, papers, documents or other objects designated therein. The Court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive. The Court may direct that books, papers, documents or objects designated in the subpoena be produced before the Court at a time prior to the trial or prior to the time when they are to be offered in evidence and may upon their production permit the books, papers, documents or objects or portions thereof to be inspected and copied by the parties and their attorneys.

nal Rules 16 and 17 and their counterparts under our State Criminal Rules. From this study the Court concluded:

> It is clear from the foregoing that Rule 17(c) is not a pre-trial discovery Rule and that we must guard against its being used as such, thus rendering Rule 16 meaningless ...
>
> Generally speaking, Rule 17(c) may be properly invoked only for the procurement of documentary *evidence* and for the production of documents which are admissible in evidence at the trial. Application of this principle impels denial of the motion now before this Court. Obviously, neither the written report of the blood analyst nor the written statements of witnesses will be admissible in evidence at the trial except, perhaps, for impeachment purposes.
>
> As to the request to examine the documents for the purpose of preparation in advance for impeachment, it is now settled in this jurisdiction that the State may be required to produce at the trial a prior written statement of a witness *after* he has been called to the stand by the State and his credibility has been put in issue. It is clear, however that this right does not arise until the time of trial and that pre-trial disclosure for impeachment purposes should not be directed. See *Wisniewski v. State*, Del., 138 A.2d 333; *State v. Thompson,* Del.Super., 134 A.2d 266; compare *Jencks v. U.S.*, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (underlining added).

138 A.2d at 346.

■ The holding in *Hutchins* applies with equal force to bar a defendant in a criminal proceeding from using Rule 17(c) to require a third party to produce for purposes of discovery before trial statements of a witness or co-defendant, regardless of their relevance. Federal case law is clear that the subpoena power conferred by Rule 17 is not intended to be used as a discovery device. That has been settled since *Bowman Dairy Co. v. United States,*

341 U.S. 214, 71 S.Ct. 675, 95 L.Ed. 879 (1951). There, it is stated:

> It was not intended by Rule 16 to give a limited right of discovery, and then by Rule 17 to give a right of discovery in the broadest terms. Rule 17 provided for the usual subpoena *ad testificandum* and *duces tecum,* which may be issued by the clerk, with the provision that the court may direct the materials designated in the subpoena *duces tecum* to be produced at a specified time and place for inspection by the defendant. Rule 17(c) was not intended to provide an additional means of discovery. Its chief innovation was to expedite the trial by providing a time and place *before* trial for the inspection of the subpoenaed materials.

In 1954, Judge Holtzoff, in *United States v. Carter*, D.D.C., 15 F.R.D. 367 (1954) summarized the intended use of Rule 17(c) as follows:

> Rule 17(c) is not a discovery rule but a device whereby a subpoena duces tecum in a criminal case may be made returnable prior to the trial [for inspection].
>
> \* \* \* \* \* \*
>
> Rule 17(c) is applicable only to such documents or objects as would be admissible in evidence at the trial, or which may be used for impeachment purposes.
>
> Rule 17(c) does not extend broadly to statements of witnesses since such statements are not admissible in evidence. While they may be invoked for impeachment purposes, such use may be made only in the event that the witness testifies at the trial.

14 F.R.D. at 371.

■ Prior statements of a witness sought for the purpose of impeachment do not ripen into discoverable evidence under Rule 17(c) until the witness has testified at trial and his credibility has been put in issue. *United States v. Cuthbertson*, 3rd Cir., 630 F.2d 139 (1980), *cert. denied,* 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981). There, the Third Circuit reaffirmed the scope of materials subject to a subpoe-

na *duces tecum* under Rule 17(c) as "relevant evidentiary material that the moving party may use at trial." (citation omitted). *Id.* at 144. Under the *Cuthbertson* standard, a party may rely on Rule 17(c) to obtain documentary evidence for purpose of impeachment. *See, e.g., United States v. Burke,* 2nd Cir., 700 F.2d 70 (1983); *United States v. Cuthbertson, supra; United States v. Liddy,* D.D.C., 354 F.Supp. 208 (1972).

However, although prior inconsistent statements are *prima facie* within the ambit of a Rule 17(c) subpoena, the right to require production of this impeachment evidence does not arise until the witness has given testimony at trial. *See, e.g., Cuthbertson, supra* at 144; *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (a subpoena under Rule 17(c) may only be employed to compel the production of documents that are "evidentiary"); *State v. Hutchins, supra* at 346.

▮▮▮ Defendant concedes, as she must, that her sole purpose for seeking pre-trial production by Brooks of statements obtained from Ross was to impeach and otherwise attack his credibility in the event his trial testimony implicated defendant in her husband's death.[6] Clearly, defendant is precluded from doing so under *Hutchins* and the Federal Rule 17(c) authorities. Assuming Brooks' notes and other unpublished materials of interviews with Ross were ultimately discoverable, such materi-

als did not attain Rule 17(c) "evidentiary" status until Ross testified at defendant's trial. Hence, the subpoena *duces tecum* issued in this case was properly quashed some ten months before trial commenced. Therefore, we affirm the Trial Court's rulings on grounds other than those relied upon by the Court. (See footnote 3 above).

## II

Defendant also asserts that she was denied her right to a fair trial by an impartial jury by the Court's denial of her motion for a change of venue.

In March, 1982, three days before the trial was to begin, defendant moved for a change of venue, stating, "there exists in Kent County so great a prejudice against [her] that the probability of a fair and impartial trial in this county is minimal." Defendant's argument before the Trial Court was a factual one: that the victim's popularity in the locale and the publicity emphasizing sex and violence was so widespread and recent as to render a fair trial in Kent County unobtainable. In support of her motion for change of venue, defendant offered copies of newspaper articles covering a time span from April, 1980 to October, 1981.[7]

Defendant also informed the Court that should it deny defendant's motion at that time, defendant requested that the denial be "without prejudice to the defendant's right to renew at the time of trial if it

---

**6.** Defendant cannot be permitted to assert on appeal other grounds for supporting her Rule 17(c) motion not raised before the Trial Court: *i.e.,* that Brooks' materials obtained from Ross were relevant to defendant's state of mind or as declarations against interest made by third parties. The timing of defendant's request for inspection was clearly premature for whatever reasons the materials may have become relevant or material at trial; and the fact is that defendant failed to reassert a demand for production and inspection of the materials at trial. Finally, the documents were not subject to production under the Jencks Act, 18 U.S.C. § 3500. No showing was made that the materials were subject to the control of the State; and in any event, defendant was not entitled to production of statements of even a government witness "for

the purpose of discrediting that witness [until] after the credibility of the witness [was] put in issue." *Wisniewski v. State,* Del.Supr., 138 A.2d 333, 339 (1957). *See Hooks v. State,* Del.Supr., 416 A.2d 189, 200 (1980); *United States v. Murphy,* 3d Cir., 569 F.2d 771, 773, *cert. denied,* 435 U.S. 955, 98 S.Ct. 1588, 55 L.Ed.2d 807 (1978).

**7.** Seven of the articles were published between April and October, 1980 with five or six articles appearing between May and October of 1981. The articles were nearly equally divided between the News-Journal, a state-wide paper, and the Delaware State News, a paper with predominantly downstate circulation, *i.e.,* in Kent and Sussex counties.

appears on voir dire that it is impossible to secure a fair and impartial jury in this county." However, the record discloses that the Trial Court elected to *defer* ruling on defendant's motion until after completion of voir dire; and defendant did not then renew her motion for a venue change.

Notwithstanding defendant's failure to reassert her venue motion, defendant argues that the Trial Court committed reversible error for not, in effect, granting *sua sponte* defendant's earlier application for a change of venue. Defendant also argues that traditional Delaware law on burden of proof for change of venue has been altered by legislation amending the Delaware Constitution. As a consequence, defendant claims that the Trial Court's denial of her change of venue application was erroneous as a matter of law.

### A.

■ Superior Court Criminal Rule 21(a) currently provides that upon motion of a defendant, the Court shall transfer the proceeding to another county "if the Court is satisfied that there exists in the county where the prosecution is pending so great a prejudice against the defendant that [he] cannot obtain a fair and impartial trial in that county." In *Parson v. State*, Del. Supr., 275 A.2d 777, 785 (1971), this Court reaffirmed the tender of proof required by Rule 21, holding that in order to secure a change of venue, defendant "must necessarily show that pretrial publicity has created such a feeling of prejudice and bias against [her] in the community that [her] right to a fair trial has been put in jeopardy." Upon review of the record, we find that defendant failed to carry the burden of proof set forth in Rule 21 and reiterated by this Court in *Parson, supra.*

During examination of the jury array, the Trial Court dismissed for cause forty-eight of ninety-eight jurors questioned. Thirteen of the forty-eight were excused for possessing some knowledge of the case based on pretrial publicity; and one was dismissed for having formed an opinion as to defendant's guilt. The remaining jurors were excused for other reasons, including opposition to the death penalty or familiarity with the victim, the defendant, potential witnesses or trial counsel. At the conclusion of voir dire and the empaneling of the jury, the Trial Judge determined (without defendant's having renewed her venue motion) that the empaneled members could render an impartial verdict. Thereupon the Court denied defendant's petition for change of venue.

We find no grounds for reversal either for abuse of discretion or error of law. The record indisputably reflects that the majority of the array had no prior knowledge of the case or preconceived opinions as to defendant's guilt or innocence. This in itself refutes defendant's claim of pervasive adverse or prejudicial publicity sufficient to require a change in venue. Defendant's trial did not take place until nearly two years after the victim's murder and almost six months after co-defendant Ross' trial. Moreover, the media reports presented by defendant as evidence of prejudicial publicity were predominantly factual in nature and were scattered over the two-year period, the most recent article being published six months before defendant's trial. This Court noted in *Parson v. State, supra* that notwithstanding widespread dissemination of accusatory or inflammatory newspaper accounts prior to trial, a motion for a change of venue generally will not be granted as a matter of law absent other evidence evincing the impossibility of empaneling an impartial jury. 275 A.2d at 785.

We must also reject defendant's contention that the popularity of the victim within the geographic area precluded the selection of an unbiased jury. Only four of the ninety-eight member venire knew of the victim or of his reputation and each was dismissed by the Court for cause. In view of the absence of a massive discharge of jurors, *see Parson* at 785, 786, and defendant's failure to otherwise show substantial adverse publicity pretrial, we cannot find

the Trial Court to have committed reversible error in refusing to grant defendant's request for a change of venue.

### B.

We turn to defendant's legal error basis for reversal. Defendant argues that a 1977 amendment of Article I, § 9 of the Delaware Constitution, deleting all reference to change of venue, either: (1) shifted to the State the burden of proving that a jury is in fact impartial; or (2) eliminated the heavy burden of proof articulated in Superior Court Criminal Rule 21 and *Parson v. State, supra.* On the latter point, defendant contends that a moving party is no longer required to prove the impossibility of obtaining a fair trial in the county wherein the prosecution is pending.

■ At the outset, we note that defendant's legal error argument was not raised before the Trial Court and, hence, is barred from appellate review by Supreme Court Rule 8.[8] However, as the question of the effect of the 1977 amendment is one of first impression, we will waive Rule 8 in the interests of justice to provide guidance to the trial courts and future litigants concerning the burden and degree of proof necessary to secure a change of venue.

■ Article I, § 9 of the Delaware Constitution originally provided, in pertinent part, that "every action shall be tried in the county in which it shall be commenced, unless when the judges of the court in which the cause is to be tried shall determine that an impartial trial thereof cannot be had in that county." This provision was deleted by a constitutional amendment in 1977. 60 *Del.Laws,* c. 519, 61 *Del.Laws,* c. 80. Defendant claims that the striking of

the change of venue provision must be interpreted as relieving the party seeking a change in venue of the burden of tendering cogent proof that a fair trial could not be had in the county in which the indictment was returned. We disagree.

■ This Court has consistently interpreted former § 9 of Article I as predicating a change of venue on a showing by the defendant of bias in the jury array.[9] *Parson v. State, supra; see also Brandywine Mushroom Corp. v. Thompson,* Del. Super., 137 A.2d 746 (1958). Given the fact that the subject of venue was covered by the Constitution, it seems reasonable to conclude that the Legislature felt precluded from legislating on the subject (or from delegating its authority to the courts) without first amending the Constitution. Thus, we interpret the constitutional amendment as simply freeing the Legislature of constitutional restraint in redefining requirements for change of venue. Neither the constitutional deletion nor the failure of the General Assembly to legislate on the subject warrants a conclusion that there be a shift in the burden of proof for change of venue from the proponent to the opponent.

■ In summary, we find no merit in defendant's argument that the deletion of venue from our Constitution either eliminated or shifted the burden of proof for a change of venue from the moving party to the non-moving party. Nevertheless, this Court is persuaded that the 1977 amendment may not be reasonably interpreted as evidencing no change whatever in the requirements for obtaining a change of venue. In our view, the deletion of venue from § 9 of the Constitution should be reasonably interpreted as intended to bring

---

**8.** Supreme Court Rule 8 provides:
*Questions Which May be Raised on Appeal.* Only questions fairly presented to the trial court may be presented for review; provided, however, that when the interests of justice so require, the Court may consider and determine any question not so presented.

**9.** We reject the State's contention that former Article I, § 9 did not apply to criminal prosecutions; hence, its deletion from the Delaware Constitution did not affect petitions for a change of venue. In our view, Article I, § 9 clearly applies both to criminal and civil actions. The cases cited by the State do not support a contrary conclusion. *See Brandywine Mushroom Corp. v. Thompson,* Del.Super., 137 A.2d 746, 747 (1968).

Delaware law on change of venue in accord with the prevailing concepts of Sixth Amendment due process.

 The Sixth Amendment to the United States Constitution and Article I, § 7 of the Delaware Constitution assure a criminal defendant a speedy and public trial by an impartial jury. A defendant asserting a claim on prejudicial pretrial publicity must generally establish that the venire was actually prejudiced by pretrial media reports. However, as the United States Supreme Court held in *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961) and this Court stated in *Parson v. State*, Del.Supr., 275 A.2d 777, 786 (1971), due process does not entitle a defendant to a trial by jurors ignorant of all facts surrounding the case. The United States Supreme Court stated:

> In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.... To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

366 U.S. at 722–23, 81 S.Ct. at 1642.

 In *Parson v. State*, 275 A.2d at 871, we held that Superior Court Criminal Rule 21 was promulgated to comply with the Sixth Amendment requirement of trial by an impartial jury. A review of relevant case law convinces us that although the substance of Rule 21 is consistent with the Sixth Amendment, it should be amended [10] to eliminate the requisite showing by a

defendant that there exists *"so great* a prejudice against defendant that he cannot obtain a fair and impartial trial in that county." (emphasis added). Rather, a criminal defendant should hereafter be granted a change of venue upon a showing that there exists a "reasonable probability" or "reasonable likelihood" of prejudice against a petitioner. *See Gordon v. Justice Court for Yuba J.D. of Sutter County*, Cal.Supr., 12 Cal.3d 323, 115 Cal.Rptr. 632, 525 P.2d 72, 76 (1974).

However, even under this lesser standard of proof, defendant's argument of prejudice must fail. As a general rule, a defendant must show that potential jurors were prejudiced in fact by pretrial publicity. *Irvin v. Dowd*, 366 U.S. 717, 728, 81 S.Ct. 1639, 1645, 6 L.Ed.2d 751 (1961). Yet, prejudice may be presumed when a moving party proffers evidence of highly inflammatory or sensationalized media coverage prior to trial. *Murphy v. Florida*, 421 U.S. 794, 798–99, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975); *Sheppard v. Maxwell*, 384 U.S. 333, 362, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966); *Estes v. Texas*, 381 U.S. 532, 542–43, 85 S.Ct. 1628, 1632–33, 14 L.Ed.2d 543 (1965). Unlike those cases in which presumptive prejudice was established, we do not find the publicity preceding defendant's trial to have so saturated and inflamed the local community that the proceeding was reduced to a "hollow formality" warranting the procedural safeguard of a change of venue. *Rideau v. Louisiana*, 373 U.S. 723, 726, 83 S.Ct. 1417, 1419, 10 L.Ed.2d 663 (1963). *See also United States v. Capo*, 5th Cir., 595 F.2d 1086, 1091 (1979). Defendant's trial began almost two years after the murder of William McBride and only thirteen of ninety-eight veniremen questioned possessed any knowledge of the case based on pretrial media reports. The jury empaneled for defendant's trial thus was fully capable of rendering a verdict grounded exclusively

---

**10.** We hereby direct the Superior Court to undertake a restatement of Rule 21 to accomplish the foregoing.

on evidence admitted at trial. Defendant failed to carry her burden of proving a denial of her right to an impartial jury. Hence, even under our modified *Parson* standard of "reasonable probability" of prejudice, we conclude that Superior Court properly denied defendant's motion for a change of venue.

## III

Defendant next contends that she was denied her right to a fair trial and due process by the Court's failure to bar the State from calling co-defendant Ross as its witness. Defendant argues that Ross' limited testimony followed by his invoking his Fifth Amendment right to refuse to testify further permitted the jury to draw inferences prejudicial to defendant in a form not subject to cross examination. Defendant says she was thereby deprived of her State and Federal Sixth Amendment right to confront the witnesses against her. *Ward v. State*, Del.Supr., 395 A.2d 367 (1978). Under the facts of this case, we find the argument unpersuasive for several reasons: (1) Ross had clearly waived his Fifth Amendment right not to testify by having testified in his own defense at his earlier trial, *see Halko v. State*, Del.Supr., 209 A.2d 895 (1965); *United States ex rel. Pendergrass v. Anderson*, D.Del., 304 F.Supp. 577 (1969); (2) since Ross' prior testimony indisputably implicated defendant,[11] the State was entitled to call Ross as

a witness and to assume that he would accede to the Court's prior rejection of his Fifth Amendment claim; (3) the record does not establish that the State knew to a certainty that Ross would refuse to give any testimony;[12] (4) Ross did not, in fact, immediately "take the Fifth", but elected to answer two preliminary questions, neither of which was damaging to defendant;[13] and (5) the State's question of Ross that prompted his refusal to testify further was directed solely to Ross' role in the victim's killing, not defendant's.[14]

On this record, we conclude that the issue presented is not one of constitutional dimension but simply of evidentiary trial error. To state it another way, the circumstances under which Ross was called to testify, the nature of his response to limited questioning and the inferences to be drawn therefrom, do not state either a Sixth Amendment or a due process claim. *See Namet v. United States*, 373 U.S. 179, 185, 83 S.Ct. 1151, 1154, 10 L.Ed.2d 278 (1963). Accordingly, we review the record to determine whether the Trial Court committed evidentiary error in allowing Ross to testify.

In *Namet*, the Supreme Court set forth a two-tier inquiry for determining whether a defendant's rights have been so affected by a witness' refusal to testify as to constitute grounds for reversal. The first inquiry is directed to "prosecutorial misconduct." *Id.* at 186, 83 S.Ct. at 1154.

---

11. Ross testified at his own trial that he, along with co-defendant Robert Kreider and defendant Judith McBride, had for several weeks planned the death of defendant's husband.

12. The record indicates that the State made several efforts before trial to determine whether Ross would testify at defendant's trial if called as a witness for the State. Ross' attorney had informed the State in late February, 1982 that Ross would exercise his Fifth Amendment right and refuse to answer any incriminating question. However, after the Court later ruled (shortly before trial) that Ross did not have "a valid Fifth Amendment reason for not talking", the State again approached Ross' attorney and was then informed that Ross "will say what he wants to say." The Trial Judge also quite cor-

rectly ruled that the Court "cannot assume that [Ross] won't talk" once he has been informed that he could not legally remain silent.

13. See footnote 2 above.

14. "Question: Did you kill Bill McBride?

Answer: Due to the advice of my attorney, I plead the Fifth Amendment from this point." Ross' attorney expressed "complete surprise" that Ross had testified at all; and the Trial Court advised Ross that he had no valid testimonial privilege and hence no legal justification for remaining silent. Ross was intractable in his refusal to give further testimony; and the Court thereupon dismissed the witness, subject to any application to have Ross held "in contempt."

To substantiate such a claim, the Court must find evidence of a "conscious and flagrant attempt" by the government to found its case upon inferences drawn from a witness' use of the testimonial privilege. However, in the context of a Fifth Amendment refusal to testify, the mere assertion of the privilege, followed by questioning involving privileged information, does not rise to "prosecutorial misconduct." Rather, such "lapses", when viewed in the context of the entire trial, must amount to planned or deliberate efforts by the prosecution to gain advantage from a witness' invocation of the Fifth Amendment.

Applying the standard delineated in *Namet,* we find no prosecutorial misconduct in defendant's case. The circumstances surrounding Ross' testimony are unlike those where a prosecutor purposely calls a witness in order to put the witness' refusal to respond before the jury. *See Sanders v. United States,* 9th Cir., 373 F.2d 735 (1967); *Fletcher v. United States,* D.C.Cir., 332 F.2d 724 (1964); *United States v. Maloney,* 2d Cir., 262 F.2d 535 (1959).

▆▆▆ Here, the record supports the conclusion that the State's attorney believed, and the Trial Court concurred, that Ross had waived any Fifth Amendment privilege as a matter of law by taking the stand in his own trial. Moreover, Ross in fact chose to answer the prosecutor's opening questions. Therefore, the record does not support defendant's contention that the Court and the prosecutor knew with any certainty that Ross would not answer if questioned.

▆▆▆ Further, the State has a right to call a witness to the stand to testify as to relevant matters of which he has knowledge. *Namet v. United States,* 373 U.S. 179, 188, 83 S.Ct. 1151, 1155, 10 L.Ed.2d 278 (1963). *See also Rado v. State of Conn.,* 2d Cir., 607 F.2d 572 (1979); *United States v. Mayes,* 6th Cir., 512 F.2d 637 (1975), *cert. denied,* 422 U.S. 1008, 95 S.Ct. 2629, 45 L.Ed.2d 670 (1975). The Court

likewise has an obligation to test whether testimony will be forthcoming, and if not, whether it is compellable. *Burkley v. United States,* D.C.Ct.App., 373 A.2d 878 (1977). *See also Frazier v. Cupp,* 394 U.S. 731, 735–36, 89 S.Ct. 1420, 1422–23, 22 L.Ed.2d 684 (1969). Hence, if error was committed at all, it did not constitute a constitutional deprivation of defendant's right of confrontation or right to a fair trial. *Namet, supra* 373 U.S. at 185, 83 S.Ct. at 1154. *See also United States v. Hiss,* 2d Cir., 185 F.2d 822 (1950).

We look next to the second ground for reversible error which, according to the Court in *Namet,* "seems to rest upon the conclusion that, in the circumstances of a given case, inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross examination...." 373 U.S. at 187, 83 S.Ct. at 1155. Defendant claims that Ross' answers to "Do you know Judith McBride?" and "Do you know Robert Kreider?" lent "critical weight" to the State's theory that William McBride was the victim of a planned, intentional killing. We cannot agree that Ross' limited testimony or any inference that may have been drawn from his invocation of the Fifth Amendment added "critical weight" to the prosecution's case.

*Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) and *Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), upon which defendant relies, are distinguishable. In each case, the admission of a confession provided the *sole* or *chief* source of evidence against the defendant. *See Rado v. State of Conn.,* 607 F.2d at 582. In contrast, Ross' testimony did not furnish the exclusive direct evidence of McBride's participation in the plot to kill her husband. On the contrary, the State, through the testimony of at least two other witnesses, produced substantial evidence implicating McBride in the fateful event.[15] Indeed,

---

15. Kreider testified that defendant asked him on several occasions to kill her husband and that

five or six methods were discussed. June Davis testified that defendant stated numerous times

defendant herself admitted her complicity in the crime.[16] Ross' testimony, while helpful, was not critical to the State's presentation. Therefore, we do not find reversible error in the circumstances of defendant's case. Having so concluded, we do not reach the effect of the Trial Judge's curative instruction to the jury.

### IV

Defendant next claims constitutional error in the Trial Court's conduct of voir dire. Defendant argues that she was constitutionally entitled *either* to have use of the State's information on prior jury service and criminal records of the members of the array *or* the right to question directly the jurors on such matters. Claiming indigency, defendant argues that the Court's denial of her motion placed her at an unfair disadvantage during the jury selection and thereby deprived her of her Fourteenth Amendment rights to due process and equal protection.

The record discloses that before trial defendant moved for the following alternative relief: either that the State be required to produce its "jury cards" or that defendant be permitted to question the members of the jury array on past jury service and criminal records. The Court denied defendant's motion, finding no "constitutional right to any information about jurors." However, the Court's denial was tentative in that it suggested that defendant file additional authority on the issue; but defendant did not do so. Nor did defendant include in her proffered voir dire any questions on jurors' past jury service or criminal records; and defendant did not thereafter press for voir dire on the mentioned subjects.

Superior Court Criminal Rule 24 provides, in pertinent part, as follows concerning both voir dire and information about prospective jurors:

### RULE 24. TRIAL JURORS

(a) *Examination.* In addition to any examination required by statute, the Court shall permit or conduct such examination as is reasonably calculated to ascertain prejudice of a juror. The Court may permit the defendant or his attorney and the Attorney General to conduct the examination of prospective jurors or may itself conduct the examination. In the latter event the Court shall permit the defendant or his attorney and the Attorney General to supplement the examination by such further inquiry as it deems proper or shall itself submit to the prospective jurors such additional questions by the parties or their attorneys as it deems proper. All questions proposed by an attorney to be used in voir dire examination shall be submitted to the Court in writing before commencement of the drawing of the jury or at such other time as ordered by the Court.

\*　　\*　　\*　　\*　　\*　　\*

(b) *Peremptory Challenges.* In capital cases the State shall be entitled to 12 peremptory challenges and the defendant or defendants shall be entitled to a total of 20 peremptory challenges. In capital cases the right to challenge shall be exercised against each juror immediately upon conclusion of the examination of such juror and the defendant or defendants shall exercise or refuse to exercise the right to challenge before the State is called upon to do so.

\*　　\*　　\*　　\*　　\*　　\*

(d) *Challenge to the Array.* The Attorney General or the defendant may challenge the array of jurors in the man-

---

that she wanted somebody to kill her husband; and the two of them had made an abortive attempt to drug and then drown him in their bathtub. Thus, any arguable inference that may have been drawn from Ross' testimony or refusal to testify was at best "cumulative support for

an inference already well established by the nonprivileged portion of witness' testimony." *Namet,* 373 U.S. at 189, 83 S.Ct. at 1156; *Rado,* 607 F.2d at 582.

**16.** See Section VII below.

ner prescribed in Chapter 45, Title 10 of the Delaware Code and the challenge shall be granted under the conditions prescribed in that statute.

(e) *Information About Prospective Jurors.* Information about prospective jurors in the Court files that is pertinent to the exercise of challenges, such as name, address, age, level of education, occupation, name of employer and spouse's occupation, shall be disclosed to the parties upon reasonable request before voir dire examination begins, unless otherwise ordered by the Court.

\* \* \* \* \* \*

All members of the array were required to complete a "Juror Qualification Form" disclosing their names, addresses and other pertinent information, as shown in Exhibit A attached hereto. 10 *Del.C.* § 4505. The questions [17] include:

4. Have you been convicted in a State or Federal court, or is there pending against you a charge for the commission of a crime punishable by imprisonment for more than one year? Yes ___ No ___ If your answer is yes, have your civil rights been restored by pardon or amnesty? Yes ___ No ___

\* \* \* \* \* \*

8. Have you served as a juror before? Yes ___ No ___ If your answer is yes, please specify:

This information was available to defendant, as provided under Rule 24(e). However, the State's "jury cards" supplemented this information with background data on the nature of a juror's prior jury service, including information as to length of jury deliberation and verdicts rendered. The State's cards also included a description of the criminal record of any member of the array.

On appeal, defendant argues that by reason of her indigency, she could not "practically" obtain from other sources the addi-

tional information possessed by the State on the jury array. As a consequence, defendant argues that the State obtained an "unfair advantage" in the jury selection process, deprived her of more effective use of her peremptory challenges and thereby denied her the right to a fair trial. On the facts and the law, defendant has failed to establish constitutional error in the Court's discovery ruling.

■ It has long been recognized that "one of the most important rights secured to the accused" is a defendant's right to peremptorily challenge members of the jury array. *Pointer v. United States,* 151 U.S. 396, 14 S.Ct. 410, 38 L.Ed. 208 (1894). However, peremptory challenges are not constitutionally required, *Stilson v. United States,* 250 U.S. 583, 40 S.Ct. 28, 63 L.Ed. 1154 (1919); and, under the facts of this case, we find no impairment of defendant's exercise of this right to have been established.

■ Defendant concedes that she had free access to the information from the juror questionnaire form, pursuant to Rule 24(e). However, defendant argues that fundamental fairness required that she have equal access to any further information obtained by the State, at least with respect to prior jury service and criminal records of the array members. To support her claim, defendant relies almost exclusively upon Louisiana case law.

In *State v. Harvey,* La.Supr., 358 So.2d 1224 (1978), the Louisiana Supreme Court enunciated the showing a defendant must make to support a claim of reversible error based on a denial of access to prior voting records and prior arrests and convictions of prospective jurors. According to *Harvey,* a defendant must establish that he could not obtain the information by other means and that the State intended to use the data in selecting the jury. However, in *Harvey,* the Court found no reversible error in denial of production of the State's records.

17. From a juror's response to these questions, a juror's qualification for jury service is then determined by Superior Court as a matter of law under 10 *Del.C.* § 4506.

Thus, even under *Harvey,* defendant would not prevail due to her failure to prove that the State's information was not otherwise obtainable by defense counsel.

We find that even though defendant was not permitted to question the array as to their prior jury experiences or criminal records, no constitutional error resulted. *See, e.g., United States v. Rosales-Lopez,* 9th Cir., 617 F.2d 1349, 1353–54 (1980), *aff'd on other grounds,* 451 U.S. 182, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981); *United States v. Batchelder,* 7th Cir., 581 F.2d 626, 634 (1978), *rev'd on other grounds,* 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979). For defendant did have other means of acquiring the requested information by recourse to the Court's Juror Qualification Form responses and public records.

Furthermore, due process is violated only when the prosecution fails to disclose information bearing on a juror's ability to render an impartial verdict. *Smith v. Phillips,* 455 U.S. 209, 221–22, 102 S.Ct. 940, 948, 71 L.Ed.2d 78 (1982). Defendant does not claim that the nondisclosure impaired her ability to obtain an impartial jury or that her Sixth Amendment right to a fair trial was violated. Therefore, considering that "[t]here is no general constitutional right to discovery in a criminal case," *Weatherford v. Bursey,* 429 U.S. 545, 559, 97 S.Ct. 837, 845, 51 L.Ed.2d 30 (1977), we find no denial of due process in the Trial Court's refusal to compel production of the State's jury cards.[18]

### V

Defendant contends that the Trial Court's refusal to ask prospective jurors two questions on voir dire examination constituted an abuse of discretion which impaired defendant's intelligent use of her peremptory challenges.

In anticipation of her defense that she killed under extreme emotional distress and acted in justification due to physical, sexual and emotional abuse inflicted upon her and her children, defendant submitted the following questions to be asked of the array during jury selection:

1. Have you even been the victim of assault or abuse whether physical, psychological or sexual? and

2. Do you have any close relatives or friends who have been the victim of marital assault or abuse, either physical, sexual or psychological?

The Trial Judge refused defendant's request, stating, "I think the questions that will be asked will cover any situation of prejudice that they may have and I'm not going to put the jury through this." Defendant argues that the rejected questions were critical to a determination of a juror's ability to render an impartial, unbiased verdict. We disagree.

██ Voir dire examination is governed by Superior Court Criminal Rule 24(a), which provides that "the court shall permit or conduct such examination as is reasonably calculated to ascertain prejudice of a juror." Since the sole purpose of voir dire is to determine a prospective juror's ability to render an impartial verdict, "[a]ny questions which go beyond the ascertainment of this ultimate fact are entirely irrelevant to the *voir dire* examination and are properly struck by the trial judge." *Parson v. State,* Del.Supr., 275 A.2d 777, 783 (1971). *See Jacobs v. State,* Del.Supr., 358 A.2d 725, 728 (1976) (no abuse of discretion in trial court's refusal to ask any members whether they had ever been crime victims

---

18. Federal appellate courts have uniformly declined to find constitutional error in a trial court's refusal to compel the prosecutor to provide the defense with information obtained by the prosecutor as to potential jurors. *See, e.g., Martin v. United States,* 5th Cir., 266 F.2d 97 (1959); *Hamer v. United States,* 9th Cir., 259 F.2d 274 (1958), *cert. denied,* 359 U.S. 916, 79 S.Ct. 592, 3 L.Ed.2d 577 (1959); *United States v.* *Costello,* 2d Cir., 255 F.2d 876 (1958), *cert. denied,* 357 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551 (1958); *Best v. United States,* 1st Cir., 184 F.2d 131 (1950), *cert. denied,* 340 U.S. 939, 71 S.Ct. 480, 95 L.Ed. 677 (1951); *Christoffel v. United States,* D.C.Cir., 171 F.2d 1004 (1948), *rev'd on other grounds,* 338 U.S. 84, 69 S.Ct. 1447, 93 L.Ed. 1826 (1949). *See also* 86 A.L.R.3d 571 (1978).

or complaining witnesses as such questions were irrelevant and in excess of the purpose of voir dire). *See also Gray v. State,* Del.Supr., 441 A.2d 209, 219 (1981).

 The scope of voir dire examination rests within the broad discretion of the Trial Court. *Young v. State,* Del.Supr., 407 A.2d 517 (1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 794 (1980); *Wright v. State,* Del.Supr., 374 A.2d 824 (1977). We review the extent of voir dire only for an abuse of that discretion, subject to essential demands of fairness. *Wright, supra* at 829. Under the circumstances of defendant's case, we cannot agree that there was an abuse of discretion in the Court's voir dire rulings. Clearly defendant's proposed questions were designed to "ascertain the advance reaction" of the jury to McBride's defense of justification. *See State v. Allen,* La.Supr., 416 So.2d 553, 554 (1982) (trial court did not err in preventing defense counsel from asking prospective jurors if they could understand the fear of being shot where defense to killing was justification based on such a fear by defendant). So framed, defendant's questions exceeded the scope of proper voir dire examination.

There was also no impairment of defendant's right to intelligently exercise her peremptory challenges. Although it has been recognized that voir dire aids the parties by eliciting facts upon which they can base their decision to use their peremptory challenges, *Young v. State,* Del.Supr., 407 A.2d 517, 520 (1979), defendant has no right to unlimited voir dire.

> In the peremptory challenge, the defendant need give no reason. But that can hardly mean that every question suggested by counsel must be put by the trial judge because it might conceivably lead to a peremptory challenge.

\* \* \* \* \* \*

In sum, the right of the peremptory challenge does not command a right to the peremptory question. Whatever the attorney's power to strike a number of venirepersons at will may be, to recognize a correlative right to question at will—without in any way identifying the motivating concern—would strip the judge of his control over the proceedings. Any question could be labelled necessary for some unspoken element in the decision to challenge peremptorily.

*United States v. Gibbons,* 2d Cir., 602 F.2d 1044, 1051 (1979), *cert. denied,* 444 U.S. 950, 100 S.Ct. 421, 62 L.Ed.2d 319 (1979).

 The defendant next alleges that the Trial Court abused its discretion in refusing to ask array members whether they had read newspaper accounts of Ross' testimony at his trial five months earlier.

Defendant claims prejudice from the fact that Ross' testimony varied significantly from her version of the events leading to the murder. This prejudice was compounded, she asserts, by Ross' refusal to testify at her trial thus giving her no opportunity through cross examination to diminish any adverse impact of a juror's knowledge of Ross' trial testimony. There is no merit to this contention. We find that the Trial Court adequately examined the jury array as to any member's knowledge of the case or Ross' earlier trial.

The record shows that the Court asked the potential jurors whether they "knew anything about this case either through personal knowledge, discussion with anyone else, or the news media." The 51 jurors responding affirmatively to this question were then interviewed individually. Nineteen of the 51 indicated that their knowledge of the case had been gained through media reports. Four jurors specifically referred to newspaper accounts of the Ross trial.[19]

**19.** Three of the four jurors were excused for cause by the Trial Court. The Court refused to strike the fourth juror for cause although he recalled the newspaper reporting that Ross had been "talked into something" because the juror indicated upon further questioning that he was unconvinced as to the truth or falsity of that information. He also stated that he had formed no opinion concerning McBride's guilt or inno-

Thus, the information sought by defendant's second voir dire question was actually elicited by the Court's question to the jury. It is clear that the jurors knew they were to reveal knowledge about the case garnered from any source, including newspaper accounts of Ross' trial. Hence, we find no abuse of discretion by the Trial Court's refusal to pose the requested voir dire questions to the jury.

## VI

Next it is urged that the Trial Court abused its discretion in refusing to sequester the jury during defendant's trial.

In a pre-trial motion to sequester the jury, defendant argued that sequestration was necessary due to extensive pre-trial publicity surrounding the case and anticipated new coverage during trial. Superior Court denied the motion but indicated that it would sequester the jury during its deliberations.[20] Defendant made no further application for sequestration once the trial had begun.

Superior Court Criminal Rule 24(f), as amended in 1976, provides that "[t]here will be no sequestration of jurors, unless ordered by the Court."[21] It is clearly the province of the Trial Judge to determine whether sequestration during trial is necessary. The disposition of a motion to sequester is reviewable for an abuse of that discretion.

Defendant asks this Court to formulate a rule requiring sequestration of a jury in capital cases upon a showing of potential prejudice to a defendant's right to a fair trial. We decline to establish a separate standard for capital cases. We thus adhere to our previous ruling in *Bailey v. State*, Del.Supr., 363 A.2d 312, 319 (1976),

cence. This juror was then peremptorily challenged by the defense.

We are of the opinion that the Trial Judge was correct in his ruling as jurors are not required to be totally ignorant of the facts and issues involved in the case upon which they sit. It is sufficient if the juror can lay aside any impression or opinion and render a verdict based on the evidence presented in court. *Irvin v. Dowd*, 366 U.S. 717, 722–23, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961).

The juror's responses to the Trial Judge's extensive questions lead us to agree with the Trial Court's implicit conclusion that his prior knowledge did not affect his ability to render an impartial verdict.

20. In ruling upon defendant's motion, the following exchange took place between the Court and defense counsel.

The Court: ... I am *not going to sequester* them during the trial, but I will during deliberations if it is necessary. I will note for the record during jury selection in the Ross case a good sixty percent of the jurors questioned said they'd never heard of the case. I know it shocked everybody.

Mr. Street: Your Honor, if we could digress in that, I am not going to argue with the ruling for sequestration. What is the reason why the Court wouldn't with the spectators and the minimal prejudice which we assume would happen ...

The Court: I think in the Bailey case it indicated it is discretionary and you should take into consideration how much publicity, how much feeling there is concerning the case. In the Bailey case, the jury was not sequestered. The Supreme Court said the Trial Judge took an awful chance because the Bailey case had very serious racial overtones and the community was very much upset about that case. I don't think this one has. I think there are a small nucleus of people who are very interested in this case, but I do not think the community is up in arms about this case in general. As I said, in questioning the Ross jurors the overwhelming majority of the people said I have never heard of the case. When I asked if they formed or expressed an opinion of his guilt or innocence they said we never heard of it.

Defendant, in her brief, contends that "inconvenience to the jurors or expense to the prosecution should not be sufficient reason to withhold sequestration of a jury...." We agree and so held in *Hughes v. State*, Del.Supr., 437 A.2d 559, 577–78 (1981) that consideration of these factors was improper and amounted to an abuse of discretion. However, as the above quoted colloquy between Court and counsel reveals, expense and juror inconvenience were not the basis for the Trial Court's ruling.

21. Prior to its amendment in 1976, Superior Court Criminal Rule 24(f) stated: "In all cases including capital cases, unless otherwise ordered by the Court, a motion of counsel or acting on its own motion, the jurors will not be sequestered and may be permitted to separate at any time during the trial prior to retirement for deliberations."

that absent a showing of actual prejudice, a trial court's refusal to sequester a jury constitutes neither reversible error nor an abuse of discretion. We find no abuse of that discretion here in that the defendant failed to establish any actual prejudice arising from inflammatory newspaper reports prior to or during her trial.

■ The fear of some media publicity during trial is seldom a sufficient reason for subjecting the jurors to the inconvenience of sequestration, *United States v. Boffa*, D.Del., 513 F.Supp. 444, 493 (1980) (citing *Margoles v. United States*, 7th Cir., 407 F.2d 727, 732–35 (1969), *cert. denied*, 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969)). Thus, the "court must be notified of any offensive publicity before it can be required to take the necessary" precaution of sequestering the jury. *Margoles, supra* at 735. The defendant must be able to make a factual showing of actual prejudice resulting from inflammatory news reports during trial. *Bailey, supra* at 319; *Tyler v. United States*, 5th Cir., 397 F.2d 565 (1968), *cert. denied*, 394 U.S. 917, 89 S.Ct. 1187, 22 L.Ed.2d 451 (1969).

> In many situations it is not difficult to recognize that that defendant's right to a fair trial has been actually prejudiced where *facts* are shown. To presume without an inference of factual prejudice that a recess of the jurors, at any particular point, operates as a matter of law to the prejudice of the defendant is logically untenable. (emphasis in original)

*Tyler, supra* at 568. Furthermore, media publicity during trial must be so "massive and pervasive that it cannot be controlled by strict admonitions to the jurors." *Boffa, supra* at 493.

We find that defendant failed to direct the Court's attention to offensive publicity during trial sufficient to warrant implementation of the "burdensome procedure" of jury sequestration, *Mastrian v. McManus*, 8th Cir., 554 F.2d 813, 819 (1977). If advised of the existence and nature of prejudicial stories the Court could have polled the jury, instructed them to ignore the arti-

cle or ordered them sequestered to avoid prejudice to the defendant. *See Mastrian, supra* at 819. However, in the absence of any such factual showing of prejudice, we find that the Trial Court adequately protected defendant's right to a fair trial by admonishing the jury daily to avoid reading, listening to or watching media accounts of the trial.

## VII

■ Defendant finally contends that the evidence adduced at trial was insufficient to support her conviction of First Degree Murder and that the jury's verdict should be set aside as against the weight of the evidence.

We note that defendant failed to move for a judgment of acquittal at the close of the evidence or within 10 days after the discharge of the jury as provided in Superior Court Rule 29(a) and (c). This Court has held that a motion for acquittal denies the sufficiency of the evidence to sustain a verdict of guilt and challenges the State's right to go to the jury. *State v. Biter*, Del.Supr., 119 A.2d 894 (1955). Assuming, but not deciding, that the defendant's failure to move for acquittal did not constitute a waiver of the issue of sufficiency of the evidence, we hold the jury's verdict of First Degree Murder to be based on substantial competent evidence and not to be against the weight of the evidence.

Eleven *Del.C.* § 636(a)(1) provides that a person is guilty of First Degree Murder when she intentionally causes the death of another person. Defendant argues that the evidence presented at trial does not establish the requisite intent to cause her husband's death but rather supports only (1) a finding that she acted recklessly; and (2) a verdict of Manslaughter under 11 *Del.C.* § 632(1). There is no merit to this contention.

Viewing the evidence in a light most favorable to the State, we find a rational jury could have found beyond a reasonable doubt that defendant possessed an inten-

tional state of mind and that death was the intended result of her plans. *Jackson v. Virginia,* 443 U.S. 307, 79 S.Ct. 2781, 61 L.Ed.2d 560 (1979), *reh'g denied,* 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *Young v. State,* Del.Supr., 407 A.2d 517 (1979). Although defendant denied that she intended her husband to die of stab wounds, she did admit upon redirect examination that she intended her husband to die by drowning. And, during earlier cross examination, defendant stated that the fact of death didn't bother her, only that the means of death—stabbing—disturbed her. She also admitted that she had once before attempted to kill her husband by drugging his food and placing his body in a bathtub and that she had intended to kill him then.

Thus, the defendant's own testimony, coupled with other witnesses' accounts of previous attempts on her husband's life, amply support a finding of intent to cause death and the subsequent verdict of First Degree Murder.

\* \* \*

Affirmed.

EXHIBIT A

SUPERIOR COURT
STATE OF DELAWARE
JUROR QUALIFICATION FORM
Please print or type your answers.
If more space is needed, use other side.

If you are unable to fill out this form, another shall do it for you and shall indicate that he has done so and the reasons therefor.

Any person who fails to return a completed juror qualification form as instructed may be summoned by the jury commissioners forthwith to appear before the jury commissioners to fill out a juror qualification form.

Information with respect to religion, national origin or economic status it not a prerequisite to qualification for jury service. Such information need not be furnished if you find it objectionable to do so.

Information concerning race is required solely to enforce nondiscrimination in jury selection and has no bearing on your qualification for jury service.

| Name | Occupation and Employer |
|---|---|
| Street Address | Marital Status |
| City, State, and Zip Code | Spouse's Occupation and Employer |
| Home and Business Telephone Numbers | Length of Residence in County |
| Social Security Number | Level of Education |
| Date of Birth and Age | Race |

1. Are you a citizen of the United States of America? Yes___ No___

2. Are you able to read, write, speak, and understand the English language? Yes___ No___

3. Do you have any physical or mental infirmity impairing your capacity to serve as a juror? Yes___ No___ If your answer is yes, please describe: _____
_____

4. Have you been convicted in a State or Federal court, or is there pending against you a charge for the commission of a crime punishable by imprisonment for more than one year? Yes___ No___ If your answer is yes, have your civil rights been restored by pardon or amnesty? Yes___ No___

5. Are you a member in active service in the armed forces of the United States or the Delaware State Guard? Yes___ No___ If your answer is yes, please specify: _____

6. Are you a member of the fire or police departments of the State or a subdivision thereof? Yes___ No___ If your answer is yes, please specify: _____

7. Are you actively engaged in the performance of official duties as a public officer who is either elected to public office or directly appointed by a person elected to public office in the executive, legislative, or judicial branches of the governments of the United States or of the State or a subdivision thereof? Yes___ No___ If your answer is yes, please specify: _____

8. Have you served as a juror before? Yes___ No___ If your answer is yes, when and where? _____

9. Have you ever been or do you have a close friend or relative who is or was employed in a police department, the office of the Attorney General, or any other law enforcement agency? Yes___ No___ If your answer is yes, please give the person's name, relationship to you, position, and name of agency: _____

10. Have you ever been or do you have a close friend or relative who is or was employed by an insurance or claims adjustment company? Yes___ No___ If your answer is yes, please give the person's name, relationship to you, position, and name of employer: _____

11. Are you a stockholder in an insurance company which issues accident or casualty insurance? Yes___ No___

12. Do you request excuse from jury service on the basis of any of the grounds listed in the attached sheet? Yes___ No___ If your answer is yes, explain the ground of your claim: _____

I swear or affirm that the responses in this form are true to the best of my knowledge.

_____ _____
(Date) (Signature)

Any person who fails to show good cause for noncompliance with a summons may be fined not more than $100 or imprisoned not more than 3 days, or both.

Any person who wilfully misrepresents a material fact on a juror qualification form for the purpose of avoiding or securing service as a juror may be fined not more than $100 or imprisoned not more than 3 days, or both.

SPACE OF FOR OFFICIAL USE ONLY Disqualified ___ Exempt ___ Excused ___ Excluded ___

Reasons: